# United States Court of Appeals

## For the First Circuit

No. 09-2317

JORGE PÉREZ-CORDERO,

Plaintiff, Appellant,

v.

WAL-MART PUERTO RICO, INC., ET AL.

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Torruella, Ripple,* and Lipez,
Circuit Judges.

Wilma E. Reverón Collazo for appellant.
Marena S. Ramírez, with whom Kenneth C. Suria and William
Estrella Law Offices, PSC was on brief, for appellees.

August 26, 2011

---

* Of the Seventh Circuit, sitting by designation.

**LIPEZ**, **Circuit Judge**.  Plaintiff Jorge Pérez-Cordero appeals from the district court's grant of summary judgment in favor of the defendants, Wal-Mart Puerto Rico, Inc. ("Wal-Mart"), Madeline Santiago, Pablo Falcón, and the Falcón-Doe Conjugal Partnership, on all counts of his civil suit alleging sex-based employment discrimination in violation of Title VII of the Civil Rights Act of 1964 and Puerto Rico law.  Pérez-Cordero claims to have been sexually harassed by Santiago, his female supervisor, and retaliated against by Wal-Mart's management, including Santiago and Falcón, for his attempts to oppose the harassment.

The district court granted summary judgment primarily on the ground that Pérez-Cordero could not show that Santiago's conduct was unwelcome, pervasive, or because of sex.  After a careful review of the record, we vacate the judgment in favor of the defendants and remand the case for further proceedings.

**I.**

We recite the facts in the light most favorable to Pérez-Cordero as the non-moving party.  See, e.g., Agusty-Reyes v. Dep't of Educ. of P.R., 601 F.3d 45, 48 (1st Cir. 2010).

Pérez-Cordero was hired as a butcher at Wal-Mart's Sam's Club store in Humacao, Puerto Rico, in 1998.  In the summer of 2000, Santiago transferred from another department within Sam's Club to become Team Leader of the store's meat department.  As Team Leader, Santiago had some supervisory authority over Pérez-Cordero.

-2-

Among other things, her position provided her the authority to design work schedules for meat department employees and to initiate disciplinary proceedings.

Early in her tenure as Team Leader, Santiago would schedule her lunch breaks to coincide with those of Pérez-Cordero. In his deposition, Pérez-Cordero testified that Santiago would ask him "every day" where he was planning to eat lunch. She would often appear at his stated lunch locale and ask to share a table with him. In Pérez-Cordero's words, "Everywhere I went to go have lunch she would show up; even McDonald's, Wendy's, los chinos, la plazoletta."

Initially, lunchtime conversations between Santiago and Pérez-Cordero were exclusively work-related. Soon, however, Santiago began sharing details about her private life with Pérez-Cordero that led him to believe that Santiago was interested in pursuing a romantic relationship with him. Around this time, Pérez-Cordero also became aware that his co-workers were gossiping about him as a result of the attention that Santiago was showing him. In one incident, he was confronted by two female meat wrappers who asked Pérez-Cordero whether he "had something to do with her" and whether he was aware that Santiago liked older men.[1] Pérez-Cordero said that hearing his co-workers' comments made him "uncomfortable." He testified that he "tried to cut off any

---

[1] Santiago is considerably younger than Pérez-Cordero.

-3-

situation" and that he would "not share anything but work." He also undertook to avoid Santiago at lunch times. In his deposition, Pérez-Cordero stated, "I would simply bring my own lunch or would tell her I was going to Wendy's and went to McDonald's so that she did not find me."

In August 2000, Santiago began making more overt propositions to Pérez-Cordero. On one occasion, while organizing items from a recent delivery to the store, Santiago told Pérez-Cordero that she was a single mother seeking a man with whom she could settle down. She asked Pérez-Cordero whether he wanted to be that man. According to Pérez-Cordero, "it was clear that she was talking about was [sic] a sex partner." Pérez-Cordero was explicit in his rejection: he told Santiago that he was not available, and that he was in a committed relationship with a woman whom he planned to marry.

That same week, Pérez-Cordero asked his girlfriend to have lunch with him at the store, and he introduced her to Santiago. Santiago later remarked to Pérez-Cordero that meeting his girlfriend had made her feel "guilty" because "when I have something with you then I will know who your woman is." Santiago made this remark in front of at least two other employees. Pérez-Cordero again made clear that he did not like or welcome Santiago's advances. He told her, "[D]on't play like that, it is very ugly."

The co-workers who had witnessed the incident talked with Pérez-Cordero about Santiago's obvious romantic interest. As Pérez-Cordero described it, "They told me what I already suspected. That she wanted to have a relationship with me and if I did not realize it I was blind because they had already talked about it among women, women's things." Pérez-Cordero told his co-workers that he had no interest in a relationship with Santiago, but he described feeling pressured by their follow-up questions: "[They] asked me are you sure you don't like anything about her, and I said no. . . . And they asked me that question it was like what is happening, what's wrong?"

When it became clear to Santiago that Pérez-Cordero did not share her interest in pursuing a romantic relationship, his working conditions began to change. Santiago supervised Pérez-Cordero more strictly than other employees and pressured him to improve his performance even though the quality of his work had not deteriorated. Santiago also assigned to Pérez-Cordero tasks which had previously been shared among all the employees in the meat department or which normally required several employees to complete. Santiago consistently scheduled Pérez-Cordero to work the closing shift, which had previously rotated among employees.[2]

_____

[2] At oral argument, the defendants disputed this contention and drew our attention to several handwritten work schedules in the record. Even taking those work schedules at face value, they do not belie Pérez-Cordero's deposition testimony. First, they show that Pérez-Cordero was, in fact, assigned the closing shift with

The closing shift required more work than other shifts and prevented Pérez-Cordero from participating in the daily departmental meetings. Additionally, Santiago reallocated the duties associated with the closing shift, which had the effect of requiring Pérez-Cordero to perform additional cleaning on top of his normal tasks.

As an example of Santiago's strict supervision of him, Pérez-Cordero notes that on September 17, 2000, Santiago called him at the store repeatedly, even though she had the day off. He described this as "unusual" behavior. In each call, she informed him that his evaluation was in her hands. She stated that "she expected sales from ten thousand to fifteen thousand dollars," and that she wanted to ensure "that everything was okay in the refrigerators, that the cleaning was done and everything was organized" because she was going to check his work the next day.

Pérez-Cordero also claims that two days later, on September 19, Santiago yelled at him in front of his co-workers when he arrived at work. He referred to it as a "scolding," "as if I were a child," and described the incident as "humiliating." Santiago was purportedly upset with Pérez-Cordero for failing to dispose of some boxes from the previous day. Pérez-Cordero stated that it was the only time he had ever been yelled at during his

greater frequency beginning around the end of August 2000. Second, the work schedules for several weeks central to this litigation are noticeably absent from the record.

employment at Sam's Club, in part because it violated the store's policy on respect for the rights of others. Pérez-Cordero reported the yelling incident to Santiago's supervisor, Meat Manager Luiz Ortiz, the day it occurred. Ortiz told Pérez-Cordero that Santiago was probably just under stress, and he volunteered to talk to her about it.

The next day, Santiago approached Pérez-Cordero while he was dressing for work at his locker. Instead of greeting Pérez-Cordero with a kiss on the cheek, as was the custom among the store's employees, Santiago grabbed Pérez-Cordero and forcefully sucked on his neck. Pérez-Cordero testified that he felt "shocked" and "surprised" by her actions, to the point that he was unable to say anything to her. Santiago then turned to another employee, Emilio Benítez, and whispered a comment to him in which she implied that Pérez-Cordero had become sexually aroused by her greeting. After telling Pérez-Cordero about Santiago's comment, Benítez told him, "You have that woman crazy about you."

Pérez-Cordero again sought out Ortiz. He told Ortiz about the incident that morning, and stated that he was uncomfortable with the hostile manner in which he was being treated by Santiago. Ortiz said that he had spoken with Santiago about the yelling incident the previous day, and he appeared reluctant to confront her again about her conduct.

Pérez-Cordero approached Ortiz again three days later, on September 22, to emphasize the gravity of the situation and to request official action. Pérez-Cordero suspected that Ortiz had never spoken with Santiago because the situation had continued to deteriorate. He described his interactions with Santiago over the previous days as having been both "impolite" and "uncomfortable."

By September 25, Ortiz had still taken no action to resolve Pérez-Cordero's concerns. Pérez-Cordero approached Ortiz for a third time, informing him that, if he was unable to solve the problem, Pérez-Cordero would take his complaints further up the chain of command. Ortiz told Pérez-Cordero not to worry and stated that he would schedule a meeting involving all the concerned parties for the following day.

When Pérez-Cordero arrived for the September 26 meeting, he was surprised to discover that the meeting was not to resolve his complaints over Santiago's harassment, but to subject Pérez-Cordero to a disciplinary proceeding known as a "coaching."[3] The session had been initiated by Santiago, purportedly because Pérez-Cordero had failed to follow directions and regulations. At the conclusion of the meeting, Ortiz spoke to Pérez-Cordero

---

[3] A "coaching" is an administrative disciplinary procedure used to inform an employee that he has done something wrong. It is an intermediate step that typically follows an oral warning but that precedes serious sanction. Employees who receive a coaching are not eligible to transfer, receive a raise, or be promoted for one year.

privately.  He indicated that he would not file the disciplinary form prepared by Santiago, but he suggested that Pérez-Cordero resolve his problems with Santiago by "going out with her, take advantage of the opportunity."[4]

Later that day, Pérez-Cordero took his concerns about Santiago to José Castro, the area supervisor, who accompanied him to speak with Falcón, the store manager.  Falcón thanked Pérez-Cordero for raising his concerns, stated that he would deal with the situation, and dismissed Pérez-Cordero for the day because Pérez-Cordero "wasn't feeling very well emotionally."  Falcón arranged a meeting with Pérez-Cordero, Santiago, and Ortiz for September 29.  In the interim, Pérez-Cordero faxed a memorandum to the store's human resources manager expressing his concerns about Santiago's treatment of him and detailing the steps he had already taken in his attempt to resolve the problem.

As reflected in notes taken contemporaneously, Pérez-Cordero raised the following concerns at the September 29 meeting:

> (1) Misunderstanding?  Disrespect?
> (2)  Blackmailing,  harassment  of  a  sexual nature and persecuted.
> (3) My emotional health and my job stability without mentioning the family.
> (4) Let them measure with the same ruler.

---

[4] Later in his deposition, Pérez-Cordero described Ortiz's comment as "You solve this, go out with her and that will ease the differences."  Nothing in our decision turns on the precise words used.

(5) Sam's policy and laws regarding trainings.
(6) Remarks made by her to Emilio (I'm sure he got an erection).
(7) I am currently taking medication to be able to sleep and I've even had problems of a
. . . .

Santiago acknowledged having made the inappropriate remark to Pérez-Cordero's co-worker Benítez and apologized to Pérez-Cordero. Although he accepted her apology on a personal level, Pérez-Cordero stated that he did not feel comfortable continuing to work under her direction. He asked Falcón to remove either Santiago or himself from the meat department. In response, Falcón stated that, because Pérez-Cordero had involved the human resources department, the matter was out of his hands. He told Pérez-Cordero to take no further action until Monday, October 2. Pérez-Cordero had not received confirmation of his fax from the human resources department and, indeed, would never receive any communication from them on the matter.

On October 2, Pérez-Cordero again spoke with Falcón. Falcón instructed Pérez-Cordero to "leave things like that." He blamed Pérez-Cordero for having "built an ugly situation" and told him that it is "easier to find a new butcher than to find a team leader." Although he informed Pérez-Cordero that Santiago would receive an official disciplinary action known as a "decision day," Pérez-Cordero did not believe him.[5]

---

[5] A "decision day" is the third and most severe level of internal disciplinary proceeding. Pérez-Cordero was skeptical that

Pérez-Cordero filed a charge of discrimination with the Puerto Rico Department of Labor's Antidiscrimination Unit on October 3, 2000. However, the Department of Labor did not notify Wal-Mart of the charge until January 11, 2001.

In the interim four months, despite Pérez-Cordero's request that Wal-Mart remove either Santiago or himself from the department, Santiago continued to supervise Pérez-Cordero in the meat department. Pérez-Cordero described that period as "a very difficult time" in which Santiago was "trying to kick [him] out." He continued to suffer from inequitable and retaliatory work assignments, including a "permanent[]" assignment to the closing shift during the Christmas season, and he continued to receive unwarranted scrutiny and discipline. In addition, Santiago denied Pérez-Cordero six weeks of required training on operating standards,[6] as well as his requested vacation time. According to Falcón, the store could not remove Santiago as Team Leader because

_____

the management would skip the first two disciplinary steps. He also claims that Santiago was present at work the following week, which is inconsistent with the "decision day" practice of requiring the sanctioned employee to skip work to craft a written account of the problem. Finally, he was informed by co-workers who were close to Santiago that she did not receive a decision day, but that Pérez-Cordero was simply told this in order to calm him down.

[6] Although the defendants contest this assertion by pointing to a certificate of achievement awarded to Pérez-Cordero in October 2000, we note that the certificate was awarded prior to Pérez-Cordero taking six of the seven required examinations, four of which were eventually administered on the same day. This evidence is ambiguous enough to create a contested factual question as to whether Pérez-Cordero was denied training.

-11-

there was no replacement for her.  However, shortly after the Department of Labor notified Wal-Mart of the charge Pérez-Cordero had filed in October, it transferred Santiago to another store and offered the Team Leader position to Pérez-Cordero.  He declined.

Throughout the period of alleged harassment, Pérez-Cordero suffered from, among other things, insomnia, anxiety, depression, and mental anguish for which he was being treated by a psychiatrist.  A psychiatric evaluation included in the record reflects a diagnosis of post-traumatic stress disorder resulting from Santiago's harassment and further indicates that Pérez-Cordero had been taking various prescription medications to combat his symptoms since at least 2001.

Pérez-Cordero filed this suit in October 2001, alleging sex-based discrimination in violation of Title VII and the Puerto Rico Anti-Discrimination Act (also known as Law 100), P.R. Laws Ann. tit. 29, § 146.  The district court entered a default against Santiago in September 2002 for her failure to respond.  See Fed. R. Civ. P. 55(a).  Two months later, on the motion of Wal-Mart and Falcón, the court dismissed the Title VII claims against Falcón and Santiago on the ground that Title VII permits suits only against employers, not individual supervisors.[7]  The court granted summary

---

[7] Although the validity of that dismissal is not before us, we note that, subsequent to the decision of the district court, we joined the majority of circuits in holding that Title VII does not impose liability on individual employees.  See Fantini v. Salem State Coll., 557 F.3d 22, 28-31 (1st Cir. 2009).  Pérez-Cordero's

-12-

judgment in favor of the defendants on the remaining claims in May 2004.  That judgment was vacated on appeal because the district court erroneously refused to consider Pérez-Cordero's opposition to the defendants' motion.  Pérez-Cordero v. Wal-Mart P.R., 440 F.3d 531 (1st Cir. 2006).

We note with some dismay that, on remand, the case remained under advisement for more than three years.  In August 2009, the district court once again granted summary judgment in favor of the defendants on all remaining claims, in an order substantially similar to the one it issued in 2004 when it deemed the defendants' motion for summary judgment unopposed.[8]  It is from this most recent entry of judgment that Pérez-Cordero now appeals.

**II.**

**A. Standard of Review**

We review the district court's grant of summary judgment de novo, drawing all reasonable inferences in favor of Pérez-Cordero as the non-moving party.  See e.g., Barton v. Clancy,

---

Law 100 claim against Falcón and Santiago survived the motion to dismiss because of their supervisory positions within Wal-Mart. The Puerto Rico Supreme Court has interpreted Law 100, unlike Title VII, to permit holding agents, officials, administrators, and supervisors civilly liable as "employers" under the statute.  See Otero-Merced v. Preferred Health Inc., 680 F. Supp. 2d 388, 392 (D.P.R. 2010) (explaining the Puerto Rico Supreme Court's decision in Rosario Toledo v. Distribuidora Kikuet, Inc., 151 P.R. Dec. 634, 647 (2000), to that effect).

[8] The district court also vacated the default judgment previously entered against Santiago on the ground that the claim against her under Law 100 lacked a sufficient factual basis.

-13-

632 F.3d 9, 16 (1st Cir. 2011). Summary judgment is appropriate only where the evidence demonstrates both the absence of any genuine issue of material fact and the moving party's entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue is "genuine" if it can "be resolved in favor of either party," and a fact is "material" if it "has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004). Summary judgment is not appropriate where "the evidence on record is sufficiently open-ended to permit a rational fact finder to resolve the issue in favor of either side." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quoting Maymí v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008)) (internal quotation marks omitted).

## B. Governing Law

Title VII provides a private right of action against any employer who "discriminate[s] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has interpreted the phrase "terms, conditions, or privileges of employment" as manifesting "a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986) (quoting L.A. Dep't of Water & Power v. Manhart, 435 U.S. 702, 707 n.13 (1978)). In furtherance

-14-

of that broad goal, Title VII also prohibits employer retaliation against those employees who oppose discriminatory employment practices.  42 U.S.C. § 2000e-3(a).

The Equal Employment Opportunity Commission ("EEOC") has promulgated guidelines[9] making clear that sexual harassment constitutes sex-based employment discrimination in violation of Title VII:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitutes sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such an individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

29 C.F.R. § 1604.11(a).

We have recognized multiple ways in which sexual harassment can affect a term, condition, or privilege of

---

[9] Congress gave the EEOC the limited authority to issue procedural regulations to carry out the prohibitions on employment discrimination set forth in Title VII.  42 U.S.C. § 2000e-12(a). EEOC guidelines interpreting Title VII are therefore not binding authority.  See Gen. Elec. Co. v. Gilbert, 429 U.S. 125, 141-42 (1976), superseded on other grounds by statute, Pregnancy Discrimination Act of 1978 § 1, Pub. L. No. 95-555, 92 Stat. 2076 (codified at 42 U.S.C. § 2000e(k)).  But as an administrative interpretation of Title VII by the agency charged with its enforcement, the EEOC guidelines "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  Meritor, 477 U.S. at 65 (quoting Gilbert, 429 U.S. at 142) (internal quotation mark omitted).

employment, as required by Title VII. See generally Valentín-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006) (delineating the legal standard for Title VII claims). Quid pro quo harassment, in which "a supervisor uses employer processes to punish a subordinate for refusing to comply with sexual demands," Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49, 52 (1st Cir. 2000), is actionable because it involves explicit and tangible alterations in the terms or conditions of employment. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 751-52 (1998). Harassment that creates a sexually hostile and abusive work environment is actionable when it is sufficiently severe and pervasive to effect constructive alterations in the terms or conditions of employment. See id. at 752-54. The Supreme Court has cautioned, however, that the "rough demarcation" between quid pro quo claims and hostile work environment claims may be of "limited utility," other than to generally describe alternative approaches to proving sex-based employment discrimination. See id. at 751.

Before the district court, Pérez-Cordero argued that Santiago's conduct constituted quid pro quo harassment and created a hostile work environment for which Wal-Mart was liable, and he further argued that Wal-Mart had unlawfully retaliated against him for reporting Santiago's conduct. On appeal, Pérez-Cordero pursues

-16-

only his hostile work environment and retaliation claims. We address those claims seriatim.[10]

## C. Hostile Work Environment

### 1. The Decision of the District Court

To succeed on a hostile work environment claim against Wal-Mart, Pérez-Cordero must establish six elements: (1) that he is a member of a protected class; (2) that he was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of his employment and create an abusive work environment; (5) that sexually objectionable conduct

___

[10] Although Pérez-Cordero also pursues his Law 100 claim against all defendants on appeal, we do not separately address that claim. Puerto Rico's Law 100 is a broad antidiscrimination statute analogous to Title VII in many respects. See Monteagudo v. Asociación de Empleados del Estado Libre Asociado de P.R., 554 F.3d 164, 169 n.3 (1st Cir. 2009) (describing Law 100 as an analogue to Title VII). As relevant here, the Supreme Court of Puerto Rico has "stress[ed] that sexual harassment is a form of discrimination by reason of sex that is proscribed by [Law 100]." Sánchez v. Elec. Power Auth., 1997 P.R. Offic. Trans. 878,520 (1997). Moreover, Puerto Rico's Law 17, which is to be interpreted in pari materia with Law 100 and which merely identifies with greater specificity conduct that Law 100 already prohibits, see Matos Ortiz v. Puerto Rico, 103 F. Supp. 2d 59. 64-65 (D.P.R. 2000) (citing Suárez Ruiz v. Figueroa Colón, 145 P.R. Dec. 142 (1998)), largely tracks the language of the EEOC guidelines regarding hostile work environment claims. See P.R. Laws Ann. tit. 29, § 155b. Given this overlap, the parties have not substantively briefed the merits of the Law 100 claim on appeal as distinct from the Title VII claim. In light of our conclusion that the record contains sufficient evidence of a hostile work environment for Pérez-Cordero's Title VII claim to survive summary judgment, we must vacate the summary judgment on the Law 100 claim as well. See, e.g., Vélez v. Thermo King de P.R., Inc., 585 F.3d 441, 452-53 (1st Cir. 2009).

was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and that he in fact did perceive it to be so; and (6) that some basis for employer liability has been demonstrated.  Agusty-Reyes, 601 F.3d at 52 (quoting Valentín-Almeyda, 447 F.3d at 94).

The district court concluded that Pérez-Cordero could demonstrate the first and, if harassment had been shown, the last of these six elements, but that he had failed to produce sufficient evidence to raise a trial-worthy issue of fact with respect to the the other elements.  It stated that Pérez-Cordero "could possibly also establish the second factor if he could prove his allegations that Santiago grabbed and hugged him and forcefully sucked on his neck in front of an associate[,] and that subsequently[] she made sexually related remarks regarding [Pérez-Cordero]'s reactions to her advances."  But it added that he would have difficulty showing that the conduct was unwelcome because "there is no indication that the kissing incident was out of the ordinary or customary [sic]."  The court found that Pérez-Cordero failed on the third element because he presented "no evidence" that the conduct alleged was "either anti-male or at least slightly sexual," and that he failed on the fourth element because, absent an "indication in the record that Santiago would greet only male employees . . . with a kiss" or that "the allegedly sexual remarks made by Santiago were motivated by [Pérez-Cordero]'s gender," Pérez-Cordero could not demonstrate

-18-

that these events were not "simply marked by minor offensive sexual connotations." It also ruled that the conduct described was neither severe nor pervasive as a matter of law because "there is no indication that these incidents were frequent, that the conduct increased in severity physically or otherwise, nor that it interfered with Pérez[-]Cordero's work performance."

2. Application of the Six-Element Test

Applying the six-element test articulated above to Pérez-Cordero's claim, we find that summary judgment is unwarranted. First, there can be no doubt, and Wal-Mart does not dispute, that Pérez-Cordero is a member of a protected class. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) ("Title VII's prohibition of discrimination 'because of . . . sex' protects men as well as women." (alteration in original)). Second, Pérez-Cordero has presented sufficient evidence to raise several genuine issues of material fact with respect to the remaining elements.

a. The Harassment Was Unwelcome

Pérez-Cordero explained in his deposition testimony that he initially sought to avoid Santiago's attention by lying about his lunch locations, and that, when Santiago escalated her pursuit by overtly propositioning him, he twice responded with a clear and unequivocal rejection. We disagree with the district court that Pérez-Cordero's acquiescence to the customary greeting among

employees -- a kiss on the cheek -- is in any way probative of his receptiveness to Santiago forcefully sucking on his neck. Additionally, the record contains no evidence that Pérez-Cordero welcomed the inequitable work assignments, public scolding, private threats, and attempted disciplinary action that constitutes much of the remainder of his claim.

b. The Harassment Was Based upon Sex

We have previously explained that, when harassment is motivated by a failed attempt to establish a romantic relationship, "the victim's sex is inextricably linked to the harasser's decision to harass." Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 229 (1st Cir. 2007). Moreover, Santiago's own comment to Benítez suggesting that she had sexually aroused Pérez-Cordero by sucking on his neck sufficiently conveys that her conduct was "at least slightly sexual." Contrary to the implication in the district court's decision, Pérez-Cordero is not required to demonstrate that Santiago's act was motivated by sexual desire, Oncale, 523 U.S. at 80, but merely that the harassment was gender-specific. Forrest, 511 F.3d at 229.

Taking the evidence in the light most favorable to Pérez-Cordero, a jury could reasonably conclude that Santiago was attempting to humiliate Pérez-Cordero, as she had when she scolded him the previous day, through an unwelcome public act of sexual aggressiveness. Cf. Marrero v. Goya of P.R., Inc., 304 F.3d 7, 20

(1st Cir. 2002) (considering, as evidence of a hostile work environment, that a supervisor "criticized [the plaintiff's] work unfairly, sometimes embarrassing her by yelling at her in front of her co-workers"). Thus viewed, Santiago's conduct is unquestionably a gender-specific form of harassment. Cf. Oakstone v. Postmaster Gen., 332 F. Supp. 2d 261, 271-272 (D. Me. 2004) (concluding that a false allegation of physical abuse filed by a female employee against her male co-worker was gender-specific harassment because it exploited sensitivities to male-on-female violence) (cited with approval in Forrest, 511 F.3d at 230 n.5). The fact that not all of the complained-of conduct has obvious sexual connotations does not diminish the force of the evidence indicating gender-based animus. Rosario v. Dep't of the Army, 607 F.3d 241, 248 (1st Cir. 2010).

c. The Harassment Was Severe and Pervasive

The Supreme Court has repeatedly emphasized that the scope of Title VII's prohibition on sex-based discrimination "covers more than '"terms" and "conditions" in the narrow contractual sense.'" Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998) (quoting Oncale, 523 U.S. at 78). "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." Meritor, 477 U.S. at 65. Nevertheless, harassment that does not directly result in tangible changes in employment -- "hiring, firing, failing to

-21-

promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," Ellerth, 524 U.S. at 761 -- must be severe and pervasive enough to bring the complained-of conduct within Title VII's requirement that workplace sex discrimination affects a "term, condition, or privilege" of employment. See Meritor, 477 U.S. at 69.

Although the district court properly identified relevant factors from our precedents when it concluded that there was no indication that Santiago's conduct was frequent, increased in severity, or interfered with Pérez-Cordero's work performance, it applied those factors far too rigidly. See Billings v. Town of Grafton, 515 F.3d 39, 48 (1st Cir. 2008). The district court's conclusions also reflect a basic misapprehension of Pérez-Cordero's claim. The single "kissing" incident on which the district court focused does not constitute the entirety of Pérez-Cordero's hostile environment claim, but rather stands as just one example of Santiago's retaliatory tactics -- in this instance, an effort to humiliate him in front of a co-worker. At this stage in the litigation, it is our responsibility to evaluate Pérez-Cordero's claim of harassment in light of "the record as a whole" and mindful of "the totality of the circumstances." Cf. Meritor, 477 U.S. at 69 (citing 29 C.F.R. § 1604.11(b)).

We have said that "the hostility vel non of a workplace does not depend on any particular kind of conduct," Billings, 515 F.3d at 48 (holding that a supervisor's harassment of his employee was sufficiently severe and pervasive even though the conduct alleged "did not include touching, sexual advances, or 'overtly sexual comments to or about her'"), and that "[t]here is no precise formula for establishing sufficiently egregious conditions." Rosario, 607 F.3d at 246. Nor do particular factors that contributed to our finding a hostile work environment in prior cases set a baseline against which future cases must be measured. Accord Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 606 (2d Cir. 2006).

As set forth above, Pérez-Cordero offered evidence describing both an initial period in which Santiago pursued him romantically and a subsequent months-long campaign of retaliation by Santiago as punishment for his rejection of her advances. Santiago threatened Pérez-Cordero with a negative evaluation, attempted to initiate a formal disciplinary proceeding against him, supervised his work scrupulously, and berated his performance in front of his co-workers. Cf. Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 40 (1st Cir. 2003) (finding sufficient evidence of severe and pervasive harassment in series of incidents of "undeserved or excessive discipline"); Marrero, 304 F.3d at 20 (same). She assigned to him tasks that were physically demanding and that

-23-

excluded him from staff meetings and training opportunities. Cf. O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001) ("[W]here a plaintiff endures harassing conduct, although not explicitly sexual in nature, which undermines her ability to succeed at her job, those acts should be considered along with overtly sexually abusive conduct in assessing a hostile work environment claim.").

Wal-Mart contends, however, that additional undisputed facts in the record clearly demonstrate that any harassment by Santiago was not severe or pervasive enough to interfere with Pérez-Cordero's performance of his work. In particular, Wal-Mart emphasizes that Pérez-Cordero was offered a promotion (which he declined), was eventually paid for his unused vacation time, and generally received positive performance evaluations. These actions do not negate the impact of Santiago's conduct on Pérez-Cordero's day-to-day work conditions. Nor does Pérez-Cordero's perseverance in staying on the job undermine his claim of sexual harassment. We have never required an employee to falter under the weight of an abusive work environment before his or her claim becomes actionable. See Billings, 515 F.3d at 51 ("The fact that Billings managed to get her work done . . . is by no means fatal to her hostile environment claim."). In short, the conduct described by Pérez-Cordero is sufficiently severe and pervasive to have altered the terms or conditions of his employment with Wal-Mart.

d. The Harassment Was Offensive

Santiago's harassment of Pérez-Cordero involved non-consensual physical contact, embarrassing sexual remarks, public scolding, exclusion from meetings and training opportunities, threats of discipline, and an assignment to him of those tasks generally regarded as least desirable. Pérez-Cordero's complaint, his deposition testimony, notes taken in the September 29, 2000, meeting, and other record evidence all reveal that Santiago's harassment caused Pérez-Cordero to suffer psychologically and emotionally. On September 28, he was sent home from work because he was not "emotionally well." As early as September 29, he reported insomnia and stated that he was taking medication to enable him to sleep. He subsequently reported insomnia, anxiety, and depression to his doctor, began seeing a counselor, and was prescribed various medications to combat these symptoms. It is clear on the record before us that Pérez-Cordero experienced Santiago's conduct as genuinely offensive. We cannot say, as the district court did, that a reasonable person in his position would disagree with that subjective assessment. See id. at 47.

e. There is a Basis for Wal-Mart's Liability

An employer is liable when a supervisor's conduct creates a hostile work environment for employees unless the employer can demonstrate that it is entitled to the Faragher-Ellerth defense. Agusty-Reyes, 601 F.3d at 53. The Faragher-Ellerth defense

comprises two necessary elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, 524 U.S. at 765. We agree with the district court that Wal-Mart cannot make that showing here. In light of Pérez-Cordero's repeated and undisputed complaints to Wal-Mart's management throughout September and October of 2000, Wal-Mart cannot satisfy its summary judgment burden on the second element of the defense. Therefore, at this stage in the litigation, Pérez-Cordero has sufficiently demonstrated a basis for Wal-Mart's liability as Santiago's employer.

**D. Retaliation**

In addition to his sexual harassment claim, Pérez-Cordero brought a claim under Title VII claiming retaliation by Wal-Mart's management in response to Pérez-Cordero's reporting of Santiago's sexual harassment. In order to make out a retaliation claim under Title VII, Pérez-Cordero must show that he engaged in a protected activity and that he subsequently suffered some materially adverse action causally linked to his protected activity. Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir. 2010). A "materially adverse" action is one that "might have dissuaded a reasonable worker from making or supporting a charge of

discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). If a plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant to "articulate a legitimate, non-retaliatory reason" for its conduct. Collazo, 617 F.3d at 46. If the defendant can meet that burden, the plaintiff must "show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." Roman v. Potter, 604 F.3d 34, 39 (1st Cir. 2010) (quoting Enica v. Principi, 544 F.3d 328, 343 (1st Cir. 2008)) (internal quotation marks omitted).

Pérez-Cordero twice engaged in protected activities. He filed a charge of discrimination with the Department of Labor on October 3, 2000. It is undisputed that the filing of such a charge constitutes a protected activity under Title VII. See generally 42 U.S.C. § 2000e-3(a). However, Wal-Mart was not notified of Pérez-Cordero's complaint to the Department of Labor until January 11, 2001. Pérez-Cordero has not provided evidence of any retaliatory conduct during the two weeks that elapsed between Wal-Mart's receipt of this information and the date it responded by transferring Santiago to another store and offering to promote Pérez-Cordero to the vacant Team Leader position.

Pérez-Cordero's retaliation claim thus depends on the evidence of retaliation for his second protected activity, which

took place both earlier and later than his formal complaint to the Department of Labor. That activity was his reporting of Santiago's conduct to Ortiz, Castro, and Falcón throughout September and October 2000. Pérez-Cordero's frequent complaints to his superiors about the harassment to which he was subjected suffice to show his "opposition" to that harassment, within the meaning of Title VII. See Crawford v. Metro. Gov't, 129 S. Ct. 846, 850-52 (2009) (stating that communicating to one's employer a belief that the employer has engaged in employment discrimination "virtually always" constitutes opposition to the activity); Collazo, 617 F.3d at 47 (finding that an employee "opposed" a supervisor's harassment by, inter alia, speaking to the supervisor individually and eliciting a limited apology); accord Matima v. Celli, 228 F.3d 68, 78-79 (2d Cir. 2000) (providing examples of protected informal opposition to discrimination that include making complaints to management, writing critical letters to customers, and supporting co-workers who have filed formal charges). Although Pérez-Cordero did not suffer a tangible employment detriment in response to this protected activity, such as a retaliatory firing, we have previously held that the escalation of a supervisor's harassment on the heels of an employee's complaints about the supervisor is a sufficiently adverse action to support a claim of employer retaliation. Agusty-Reyes, 601 F.3d at 57.

The record reveals sufficient evidence from which a reasonable jury could conclude that Santiago's discriminatory harassment escalated in response to Pérez-Cordero's complaints. Pérez-Cordero first complained to Ortiz about Santiago's harassment on September 19, 2000. Although the conduct Pérez-Cordero complained of -- a public scolding -- was not itself sexual, it nevertheless constituted sexual harassment, as it was part of Santiago's reprisal against Pérez-Cordero for her failed, public attempt to establish a romantic relationship with him. At the September 19 meeting, Ortiz promised to talk to Santiago, and later confirmed to Pérez-Cordero that he had done so.[11] Pérez-Cordero was subjected to Santiago's inappropriate greeting and sexual comment the next day. Several days later, after two more complaints by Pérez-Cordero to Ortiz, Santiago and Ortiz initiated a meeting to discipline Pérez-Cordero, at the end of which Ortiz encouraged Pérez-Cordero to solve his problems by "go[ing] out with" Santiago.

A reasonable jury could interpret Santiago's September 20 greeting, the first overtly sexualized act of harassment alleged, as an escalation in both the nature and intensity of her harassment. Similarly, because of the official imprimatur suggested by Ortiz's involvement and the fact that it implicated

_____

[11] Although Pérez-Cordero testified at his deposition that he did not believe Ortiz, a reasonable jury could conclude from the conduct that followed that Ortiz talked to Santiago on September 19, as he stated.

Pérez-Cordero's employment benefits, the disciplinary meeting on September 25 can reasonably be viewed as both another increase in the severity of Santiago's retaliation and a weightier deterrent to subsequent complaints.  Cf. Lockridge v. Univ. of Me. Sys., 597 F.3d 464, 472 (1st Cir. 2010) ("We think that, under certain circumstances, the denial of an employee's request for office space could dissuade a reasonable person from making or supporting a charge of discrimination."); Valentín-Almeyda, 447 F.3d at 95 (concluding that "disadvantageous transfers or assignments" can be materially adverse).  In addition, the temporal proximity between Pérez-Cordero's initial complaints and these retaliatory actions is sufficient to establish the causal connection required for a prima facie case of retaliation.  See Collazo, 617 F.3d at 49-50; see also DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008) ("[O]ur law is that temporal proximity alone can suffice to 'meet the relatively light burden of establishing a prima facie case of retaliation.'" (quoting Mariani-Colón v. Dep't of Homeland Sec., 511 F.3d 216, 224 (1st Cir. 2007))).

There is admittedly some overlap between Pérez-Cordero's discrimination claim, which depends on proof that the hostile work environment was "because of sex," and his retaliation claim, which seeks to characterize the same hostile work environment as caused by his protected activity.  See Burlington N. & Santa Fe Ry. Co., 548 U.S. at 63 ("[Title VII's] substantive provision seeks to

-30-

prevent injury based on who they are, <u>i.e.</u>, their status. The anti-retaliation provision seeks to prevent harm to individuals based on what they do, <u>i.e.</u>, their conduct."). However, where, as here, the evidence can reasonably be viewed as demonstrating either discriminatory animus or retaliatory animus, we may consider the same evidence in assessing the sufficiency of both of the plaintiff's claims. <u>See</u> <u>Agusty-Reyes</u>, 601 F.3d at 52-57 (finding sufficient evidence on appeal from summary judgment of both severe and pervasive harassment and retaliation through the escalation of that harassment); <u>cf.</u> <u>Morales-Vallellanes</u> v. <u>Potter</u>, 605 F.3d 27, 37-40 (1st Cir. 2010) (reviewing an employer's conduct to determine simultaneously the sufficiency of employee's sex-discrimination and retaliation claims).

In response to Pérez-Cordero's prima facie case of retaliation, the defendants have not attempted to advance a legitimate, non-retaliatory reason for the conduct of Wal-Mart's managers, nor is one readily apparent from the record. Consequently, the district court's grant of summary judgment in favor of Wal-Mart on Pérez-Cordero's retaliation claim was erroneous.

**III.**

For the foregoing reasons, we vacate the district court's entry of summary judgment for Wal-Mart on Pérez-Cordero's claims alleging sexual harassment and retaliation under Title VII. We

likewise vacate the district court's entry of summary judgment in favor of all defendants on Pérez-Cordero's claims under Puerto Rico's Law 100. We remand the case for further proceedings consistent with this opinion. Costs are awarded to the appellant.

<u>So ordered.</u>