# United States Court of Appeals
## For the First Circuit

No. 08-2168

RUTH ROSARIO,

Plaintiff, Appellant,

v.

THE DEPARTMENT OF THE ARMY, et al.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Torruella, Baldock,* and Lipez, Circuit Judges.

Vladimir Mihailovich for appellant.
Rebecca E. Ausprung, with whom Rosa Emilia Rodríguez-Vélez,
United States Attorney; R. Brian Bohlen, Special Assistant United
States Attorney; and Ginette Milanés, Assistant United States
Attorney, were on brief, for appellees.

June 2, 2010

---

*Of the Tenth Circuit, sitting by designation.

**LIPEZ, Circuit Judge**. Appellant Ruth Rosario brought this suit against the Department of the Army and several individuals,[1] alleging that a two-year campaign of sexual harassment by her co-worker at an Army medical clinic subjected her to a hostile work environment in violation of Title VII of the Civil Rights Act. See 42 U.S.C. § 2000e-2(a)(1). In granting summary judgment for the defendants, the district court concluded that the alleged conduct amounted only to a lack of courtesy and professionalism rather than gender-based harassment sufficiently severe or pervasive to create a hostile work environment. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

On de novo review, the record does not permit that conclusion. We therefore vacate the summary judgment and remand for further proceedings.

**I.**

We recount the facts in the light most favorable to appellant and likewise draw all inferences in her favor. See Lockridge v. Univ. of Me. Sys., 597 F.3d 464, 468 (1st Cir. 2010). Rosario, a civilian employee with the Department of the Army, was transferred to the Rodríguez Army Health Clinic at Fort Buchanan,

---

[1] The other defendants are Dr. Francis J. Harvey, who was Secretary of the Army when the lawsuit was filed; Pete Geren, Harvey's successor in the position; Ivan Arroyo, Rosario's supervisor and the alleged harasser; and Lieutenant Colonel (LTC) Kyle D. Campbell, who was in charge of the health clinic during the relevant time period.

Puerto Rico, in February 2001. In her position as a medical records technician, she worked at the clinic's front desk, and her duties included checking patients in upon their arrival and maintaining computerized health records. Defendant Arroyo, another civilian clinic employee who worked in close proximity to Rosario and performed similar duties, trained her. Beginning in March 2001, when Arroyo believed that Rosario planned to apply for an open supervisor's position, he began criticizing her to other employees and expressing doubts about her abilities.

In April 2001, after Saldine Strassner was appointed to fill the vacancy, Arroyo's treatment of Rosario and others at the clinic became abusive on a daily basis. He would throw medical records around, throw personal belongings into the trash, and disparage his co-workers with derogatory names and racial comments. According to Rosario, an African-American woman identified as Private Carter broke down in tears at one point and ultimately left the section "due to the continue[d] daily hostile environment cause[d] by [Arroyo]." In late April, according to Rosario, Arroyo started to make her life miserable by, inter alia, constantly complaining about the way she dressed, always watching the clock when she conversed with patients, and "telling doctors [who worked at the clinic] about [his] personal opinion about my person." She claimed he would complain about her spending time talking with

patients, but made no comments when other employees talked or joked with them.

In May 2001, Arroyo started bringing people to the section to look at Rosario's clothes, which he criticized as overly revealing, and he pointed out to the others that her underwear was visible. Another clinic employee, Miguel Hernández, testified that Arroyo repeatedly told him that Rosario's clothing made him "uncomfortable."[2] Hernández reported that Arroyo would "talk[] about her underwear and especially her panties" within five feet of where Rosario sat, "right behind her back, and she could listen to that, when she was talking to the patients."[3] Between July 2001 and January 2002, Arroyo continued to closely observe Rosario whenever she conversed with patients, at times walking behind her and making faces as he looked at the person with whom she was speaking. These criticisms and behaviors occurred on a daily basis.[4]

---

[2] Hernández and others whose testimony is reported in this factual summary appeared as witnesses at an evidentiary hearing conducted by the Army's Equal Employment Opportunity (EEO) investigator on July 3, 2004.

[3] At the EEO hearing, Arroyo explained that he and Rosario sat in close proximity to each other, and the way she sat, "her underwear was being exposed. The backside was being exposed to me."

[4] When asked how many times Arroyo brought people to see her underwear, she replied: "[I]t was almost every day. Every day he have something to say with my clothes."

Throughout the first half of 2002, Arroyo regularly complained to Rosario about various issues: the family pictures and other personal items, including food, on her desk; "[t]he way [I] walk, move, talk." He threw away Rosario's food and removed the other items from her desk. He continued to voice concerns about the way she dressed "and have everybody come to my area and check me out." A patient stopped her one day at the post store and advised her to watch out for Arroyo because he was talking about her negatively to others. An employee who worked in another section of the clinic, Olga Cournier, testified that Arroyo would "call the other guys, guys not necessarily that work there" to Rosario's area, where they would "meet and talk, and then point at her and then laugh."[5]

A supervisor, Staff Sergeant Pedro Maldonado, brought Rosario and Arroyo together in March 2002 to discuss the difficulties between them. Although they shook hands and, according to Rosario, "agree[d] to put a stop there," the conduct continued. Maldonado stated that Rosario was not the only female whom Arroyo treated badly: "He would do it to other females that used to work there. He'd just intimidate them."[6] Cournier

---

[5] Although Cournier did not explicitly state that these comments were overheard by Rosario, it is a fair inference that, like the comments reported by Hernández, the conversation and laughter she described occurred in close proximity to Rosario.

[6] Maldonado went on to say that "that's the way he treated all the females and also the males. But, for some reason or another,

-5-

testified that Arroyo would talk to other employees in a pleasant manner, "but, when he directed to her [Rosario] he would be, like, in a nasty way."

Arroyo became the supervisor of the medical records section in July 2002. He continued to criticize Rosario and respond to her in ways she found humiliating, including making "exaggerated" movements – apparently mocking her – when she spoke to him. Cournier testified that, unlike Arroyo's behavior with other employees who worked the front desk, when Rosario was there Arroyo was "always . . . behind her, looking, and always . . . he'd be watching on whatever she was doing or whatever she was saying." Maldonado stated that Arroyo made it difficult for Rosario to perform her job, challenging every decision, saying "'[d]on't do

---

the other females never said anything because she[sic] was a reservist, and when my time is gone, I'm gone." Although the syntax is confusing, it appears that Maldonado was saying that female Army reserve members who worked at the clinic did not complain about Arroyo's treatment because they were assigned there only temporarily.

Later, when questioned about his comment that Arroyo would treat both men and women poorly, Maldonado said Arroyo would not treat them "the same way he was treating her." Maldonado explained:

> He behaves – his behavior towards everyone was the same. But for [Rosario], it was more a gender issue . . . [b]ecause, everything was about the way she dressed. Everything was about her. Everything was about the way she talks to people.

In emphasizing Maldonado's statement that Arroyo mistreated both men and women, the district court overlooked Maldonado's explanation of Arroyo's distinct behavior toward Rosario.

-6-

this, don't do that, why did you do this, why did you do that.'" Although Rosario reported his behavior to higher level supervisors, no action was taken against him.[7]

Later in 2002, Arroyo initiated formal counseling of Rosario concerning the dress code,[8] but evidence presented at the

---

[7] Rosario testified that, when she met with her second-level supervisor, LTC Campbell, "he didn't take me serious[ly]." Maldonado testified that he also reported Arroyo to Campbell, who told Maldonado "[t]hat he was going to handle it." Maldonado assumed that nothing was done, however, "[b]ecause I was there the whole time and things that began there continued on and on." He further recounted:

> When I brought it up to LTC Campbell and the rest of the folks who were in the chain of command, they didn't do anything about it. But he continued to behave towards her the same way as before. He had the same behavior. Nothing changed.

[8] This formal counseling appears to have consisted of Arroyo's completing a "Developmental Counseling Form," an official document issued by the US Army Training and Doctrine Command, and Rosario's written response. The form, dated November 6, 2002, explains the purpose of the counseling as follows:

> To develop a clear understanding on appropriate dress code in the work place. Ruth I want to let you know I have done lots of research about the subject on dress code, I have talked to many high ranking civilian here in PR and in the States to get advice and here is the answer. There is not a dress code for civilians. The employee needs to be aware of the work place, consider the customers and the coworkers, and dress accordingly. I can not enforce a dress code on anybody. You know where you work, your customers, and your coworkers as well as supervisors. If you make someone unco[m]fortable about the way you are dress in the work place and they voice a complaint about you, you will have to deal with that situation accordingly. I will not enforce a dress code because there i[s] not one.

In her handwritten response on the form, dated 11/21/02, Rosario

EEO hearing supports her contention that her clothing was always appropriate. Maldonado, Hernández and Cournier all testified that they did not consider her attire inappropriate, and Rosario asserted that her nearly twenty years of experience in the private and government sectors provided her with "the knowledge [of] what to wear or not."[9] Indeed, Arroyo acknowledged at the EEO hearing that, after March 2002, her clothing had improved "300 percent" and he considered her attire proper. In April 2003, however, Arroyo complained to Campbell about plaintiff's dress, and the record contains a May 1, 2003 memorandum listing Arroyo's expectations for Rosario that includes the following paragraph on her manner of dress:

> Sound judgment very important with the pursue[sic] of excellence. The way we dress for the work place should be "business like." On occasion the way you have dress has made me and co-workers very uncomfortable and clearly seen by the rating officials. In the workplace you[] are required to stand, ben[d],

---

queried why Arroyo initiated the counseling if there was not a dress code and stated that she "always presented [her]self in a professional, clean, office attire."

At the EEO hearing, Arroyo testified that he did not remember the incident that triggered the form, but that he "must have seen something that was totally in contrary to . . . what we have talked about." He said the misunderstanding was cleared up, and the counseling never took effect.

[9] Campbell, however, testified that he was informed by another clinic employee, Specialist Lara, that female patients and wives of patients at the clinic had complained about Rosario's "excessively revealing clothing." He described the issue as "sheer or see-through clothing and/or very low cut blouses."

reach above for documents and you need to be fully aware that clothing that reveals underwear, clothing that attracts the attention of others, again the standard is business like. . . .[10]

Rosario also alleged as evidence of Arroyo's discriminatory treatment the performance evaluation he gave her in April 2003 – an overall rating of "successful" – which was lower than the "excellent" ratings she had previously received from other supervisors. She presented evidence as well that he obtained sexually oriented jokes from the computer and commented on them in her presence, said that she was fat and had delinquent children, and told her co-workers that she was dressing like a "woman of the streets."[11]

As a result of Arroyo's behavior toward her, Rosario felt uncomfortable every day and did not want to go to work. She became depressed, started losing her hair, experienced panic attacks, and

---

[10] Arroyo acknowledged that the memo was never given to Rosario and explained that it was prepared at that time because a new rating period was beginning. He stated that it was "an initial counseling for a new rating period" and that "I am counseling her on expectations on the new rating period that's about to begin."

[11] Cournier testified that Arroyo would get sexually oriented jokes from the computer and "then be talking about it and showing pictures or whatever." She said he did that in a loud voice, "mostly . . . when [Rosario] was there." Maldonado reported that Arroyo commented to him and "to everybody else too[,] [t]o other guys" that she dressed "like a street girl, or a working girl." Maldonado explained that labeling someone a "woman of the streets" or "a street girl" was not as bad as calling her a prostitute, that it was "more girlish, you know, her breasts were out or showing her cleavage."

eventually was hospitalized. She needed psychiatric treatment and medication, and attributed the breakup of her marriage to her situation at work.

In September 2003, Rosario filed a formal discrimination complaint with the Army's Equal Employment Opportunity Office and submitted a seven-page statement detailing many of the circumstances described above. Following the evidentiary hearing, the agency found for the defendants. Rosario then filed this lawsuit alleging that she was subjected to gender and national origin discrimination in violation of Title VII. She subsequently dropped the national origin claim, and the district court addressed only the gender-based hostile work environment claim in its decision. The court held that the record showed "Mr. Arroyo [to be] a rude man that lacked courtesy and professionalism," but that the evidence was inadequate to prove a violation of Title VII. Concluding that Rosario "failed to prove that she was subjected to conduct sufficiently severe or abusive so as to constitute hostile work environment based on sex," the court granted summary judgment for defendants. This appeal followed.

## II.

We review a grant of summary judgment de novo and may reverse the district court's ruling if, after considering the facts and drawing "all inferences in favor of the non-moving party, the evidence on record is sufficiently open-ended to permit a rational

fact finder to resolve the . . . issue in favor of either side." Napier v. F/V Deesie, Inc., 454 F.3d 61, 65 (1st Cir. 2006) (internal quotation marks and citation omitted). We review the law relating to hostile work environment claims before considering its applicability to the evidence presented by Rosario.

## A. Legal Background

Title VII's prohibition of discriminatory employment practices extends to sexual harassment in the form of a hostile or abusive work environment. Lockridge, 597 F.3d at 473. To prove a hostile work environment claim, the plaintiff must demonstrate that the complained-of conduct was "'sufficiently severe or pervasive so as to alter the conditions of the plaintiff's employment and create an abusive work environment.'" Id. (quoting Forrest v. Brinker Int'l Payroll Co., LP, 511 F.3d 225, 228 (1st Cir. 2007)); see also Harris, 510 U.S. at 21. That environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).[12] There is no precise formula for establishing sufficiently egregious

---

[12] To succeed with a Title VII hostile work environment claim, a plaintiff also must prove that she (or he) is a member of a protected class, that she was subjected to unwelcome sexual harassment based upon sex, and that there is a basis for employer liability. Agusty-Reyes v. Dep't of Educ. of P.R., 601 F.3d 45, 52 n.6 (1st Cir. 2010).

-11-

conditions.  Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 83 (1st Cir. 2006).

> We examine all the attendant circumstances including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance.

Id.; see also Harris, 510 U.S. at 23.  "'Subject to some policing at the outer bounds,' it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment."  Marrero v. Goya of P.R., Inc., 304 F.3d 7, 18 (1st Cir. 2002) (quoting Gorski v. N.H. Dep't of Corr., 290 F.3d 466, 474 (1st Cir. 2002)).

Although "'[t]he workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins,'" id. at 19 (quoting Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000)), the "accumulated effect" of repeated verbal attacks and physical intimidation in the workplace may reasonably be found to constitute sexual harassment within the meaning of Title VII. O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001); see also Faragher, 524 U.S. at 788 (stating that the hostile work environment standards are "sufficiently demanding to ensure that Title VII does not become a 'general civility code'" (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80

-12-

(1998))). The harassing conduct need not be overtly sexual in nature. O'Rourke, 235 F.3d at 729. "[W]here a plaintiff endures harassing conduct, although not explicitly sexual in nature, which undermines her ability to succeed at her job, those acts should be considered along with overtly sexually abusive conduct in assessing a hostile work environment claim." Id.

## B. Rosario's Claim

In defending the district court's ruling in their favor, the defendants point to the Supreme Court's assertion that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious)" do not amount to a hostile work environment. Faragher, 524 U.S. at 788 (quoting Oncale, 523 U.S. at 82). They contend that most of the comments and actions highlighted by Rosario were intended to address the issue of appropriate office attire, and they emphasize that no witness stated that Arroyo ever made any sexual advances toward Rosario or said he was sexually interested in her.

Even if Arroyo's alleged behaviors could reasonably be viewed as offhand comments or isolated episodes, some of which were motivated by legitimate workplace concerns, that view is certainly not the only one that could reasonably be drawn from the record. As described above, Rosario's allegation that she was subjected to constant harassment from Arroyo over an extended period of time was substantiated by the testimony of multiple witnesses at the EEO

-13-

hearing, including Arroyo's immediate supervisor, Maldonado. The record contains evidence that, throughout a two-year period, Arroyo complained about Rosario's appearance on a daily basis, regularly drew the attention of her co-workers to her body and undergarments, shadowed her closely when she interacted with patients, challenged her decisions, mocked her when she spoke to him and, on occasion, described her as a street woman to other employees and criticized her to doctors and patients.

The validity of the primary justification offered for Arroyo's frequent interactions with Rosario – her attire – was undermined by Maldonado's, Hernández's and Cournier's testimony that they considered Rosario's clothing to be appropriate and by Arroyo's own testimony that he found no problem with her clothing after March 2002. Moreover, the conduct began when Arroyo was Rosario's co-worker, rather than her supervisor – when he presumably had no authority to challenge her manner of dress. Later, when he became her supervisor, he admitted that no dress code existed for civilian employees at the clinic, yet he continued to make an issue of her clothing. He initiated a counseling report in the fall of 2002 and was still questioning her attire the following spring.

Although the sexually oriented jokes reported by Cournier may not have amounted to much on their own and were of uncertain frequency – indeed, Rosario did not cite them in the report

-14-

attached to her administrative complaint – they nonetheless suggest a lack of respect by Arroyo for his female colleagues, lending weight to the inference that his behavior toward Rosario was inappropriately motivated by gender. That was not, however, the only evidence that his conduct was "because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). Maldonado testified that Arroyo treated other females who worked at the clinic similarly, observing that "[h]e'd just intimidate them." Maldonado named Private Carter in particular and stated that Arroyo "drove her nuts." Arroyo's repeated conversations with others about Rosario's underwear "and especially her panties" (as reported by Hernández), as well as his references to her as a woman of the streets in conversations with Maldonado and "other guys," provides additional support for a finding that his behavior toward Rosario was sex-based.

The defendants' focus on the absence of evidence showing that Arroyo was attracted to Rosario is, as an initial matter, misdirected. "[H]arrassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." Oncale, 523 U.S. at 80; see also O'Rourke, 235 F.3d at 729. Moreover, while there is no direct evidence that Arroyo was sexually interested in Rosario, Hernández testified that Arroyo's treatment of Rosario prompted him to ask if Arroyo had a crush on her. Hernández said he explained to Arroyo that "that's what it looks like. That it's so personal that you're just having a

-15-

frustration about that woman." Although other cases may present more explicit evidence of sex-based motivation, see, e.g., Marrero, 304 F.3d at 19 (noting "humiliating sexual remarks and innuendos," such as "the redhead is really hot" and "the redhead is on fire"); Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49, 55 (1st Cir. 2000) (noting that the head of the academic committee considering plaintiff's promotion repeatedly asked her for dates and "used suggestive language toward her"), the record here contains ample circumstantial evidence for a jury to conclude that Arroyo's behavior was triggered by Rosario's gender. See EEOC v. NEA, Alaska, 422 F.3d 840, 844 (9th Cir. 2005) ("[T]here is no legal requirement that hostile acts be overtly sex- or gender-specific in content, whether marked by language, by sex or gender stereotypes, or by sexual overtures.").

The fact that certain of the complained-of conduct appeared to have no sex-based connotation at all – for example, throwing her food away and removing items from her desk – does not diminish the force of the evidence indicating gender-based animus. Indeed, as we have noted, such acts may be added to the mix in assessing a hostile work environment claim. O'Rourke, 235 F.3d at 730 (noting "the reality that incidents of non-sexual conduct . . . can in context contribute to a hostile work environment"); see also Marrero, 304 F.3d at 20. Nor is Rosario's claim defeated by evidence that male employees experienced some of the same

-16-

mistreatment by Arroyo. The evidence does not show any male employee enduring Arroyo's criticism and offensive behaviors on virtually a daily basis for an extended period of time, as did Rosario. The record as a whole would thus permit a reasonable jury to conclude that Rosario was exposed to harassment that differed in both kind and degree from that imposed on male employees. See Oncale, 523 U.S. at 80 ("'The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" (quoting Harris, 510 U.S. at 25 (Ginsburg, J., concurring))); NEA, Alaska, 422 F.3d at 845 ("[T]he ultimate question under Oncale is whether [the supervisor]'s behavior affected women more adversely than it affected men.").

We thus conclude that Rosario adduced sufficient evidence for a jury to find that she was subjected to conduct that was "so severe or pervasive that it altered the terms or conditions of her employment." Pomales, 447 F.3d at 83. The behaviors she alleges go well beyond "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Faragher, 524 U.S. at 788 (quoting Barbara Lindemann & David D. Kadue, Sexual Harassment in Employment Law 175 (1992)). She presented evidence of longstanding harassment that interfered with her work on a daily basis and ultimately caused harm to her emotional stability and health. This case is thus a

-17-

far cry from <u>Lee-Crespo</u> v. <u>Schering-Plough Del Caribe, Inc.</u>, 354 F.3d 34, 46 (1st Cir. 2003), cited by the defendants, where "the complained of conduct was episodic, but not so frequent as to become pervasive; was never severe; . . . and significantly, was never . . . an impediment to [the plaintiff's] work performance." Rather, our observation in <u>Marrero</u>, where the harassment was "more or less constant" for some nineteen months, is apt here: "[T]his case is easily distinguished from those in which courts have refused to find a hostile work environment based solely on sexual comments that are few and far between." 304 F.3d at 19.

In sum, a jury reasonably could find that Rosario met her burden to show conduct that created a hostile work environment within the meaning of Title VII. Hence, we vacate the district court's grant of summary judgment for defendants and remand the case for further proceedings.[13] Costs are awarded to appellant.

<u>So ordered.</u>

---

[13] Although the district court's ruling focused primarily on the "severe or pervasive" element of Rosario's claim, it explicitly or implicitly dealt with all aspects of a Title VII hostile work environment claim other than employer liability. <u>See</u> <u>Agusty-Reyes</u>, 601 F.3d at 52 n.6 (listing six elements). Our analysis follows the same course. We leave the issue of employer liability to the court and the parties on remand, as it was not argued on appeal.