# United States Court of Appeals
## For the First Circuit

No. 14-1068

SHELLY L. FLOOD,

Plaintiff, Appellant,

KERI FLOOD,

Plaintiff,

v.

BANK OF AMERICA CORPORATION; FIA CARD SERVICES, N.A.,

Defendants, Appellees,

ABM JANITORIAL SERVICES NORTHEAST, INC.,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Howard, Selya, and Lipez,
Circuit Judges.

Marshall J. Tinkle, with whom Hirshon Law Group, PC was on brief, for appellant.
Caroline F. Turcotte, with whom Alice A. Kokodis and Edwards Wildman Palmer LLP were on brief, for appellees.

February 27, 2015

**LIPEZ, Circuit Judge**.  Shelly Flood ("Flood") alleges that her former employers, Bank of America Corporation and FIA Card Services, N.A. (collectively, the "Bank"), subjected her to a special set of rules and standards, and otherwise discriminated against her, because of her bisexuality.  When Flood could no longer endure the disparate treatment at the Bank, she stopped reporting to work and the Bank terminated her for job abandonment.  She brought this action against the Bank for employment discrimination under the Maine Human Rights Act ("MHRA") and for two species of defamation under Maine common law.  Adopting the magistrate judge's recommendation, the district court granted summary judgment to the Bank on all counts and Flood appealed.  We now vacate summary judgment as to the wrongful termination and hostile work environment portions of Flood's discrimination claim and affirm as to Flood's other claims.

## I.

The facts are presented in the light most favorable to the non-moving party, Flood, drawing all reasonable inferences in her favor.  Martinez-Burgos v. Guayama Corp., 656 F.3d 7, 11 (1st Cir. 2011)

Flood was a customer service employee at the Bank's 24-hour call center in Belfast, Maine from July 24, 2006 to October 1, 2010.  In March 2009, she took on a new role at the call center that required her to handle a larger call volume.  That same month,

Flood met Keri Flood ("Keri"), an employee of ABM Janitorial Services Northeast ("ABM") who cleaned at the call center where Flood worked. Flood and Keri began dating in October 2009. They would frequently spend their break times together and Keri would sometimes drop by Flood's desk to leave a soda or talk for two or three minutes.

The alleged antagonist in this suit is Diana Castle, a senior official at the Belfast branch who oversaw 200 associates, including Flood, and Flood's immediate supervisors, Jeremy Treneer and Michelle Tabbutt. Castle was also Flood's mentor in the Bank's mentoring program for female employees.

The precipitating event occurred in April 2010, when Castle and Flood were at a bank social event where Flood was sitting at the LGBT table. Castle came over to the table and saw a photo of Flood and Keri embracing at a local bar. According to Flood, Castle then gave her a look of shock and walked away. Flood believes this was the first time Castle became aware of Flood's sexual orientation. After seeing the photo, Castle contacted the sponsor of the LGBT table to complain that the picture was inappropriate because it depicted alcohol; the sponsor then removed the photo from the premises. Flood notes that no photos of heterosexual couples were removed.

Prior to the April photo incident, Castle had engaged with Flood in a friendly manner. Afterwards, though, she withheld

-3-

pleasantries and smiles in the hall, made disparaging remarks about Flood's hair and eating habits, and glared at Flood. During their mentoring meetings, Castle began to inquire about Flood's relationship with Keri. When Castle would see Keri and Flood in each other's company, she cast what Flood perceived to be disapproving looks at them and made comments about "always" seeing them together.

Flood also noticed a change in the reception to her job performance. In March 2010, Tabbutt began assisting Treneer with employee evaluations. In April 2010, roughly concurrent with the photo incident, Flood began receiving what she perceived to be unduly critical feedback on her work. Although her 2009 evaluations had been positive, she was now receiving "does not meet" grades on calls that she believes would have been graded "wow" before.

There were other changes as well. Although co-workers often discussed their personal lives (including frequent talk of plans for Tabbutt's Summer 2010 wedding), Flood was instructed to keep conversations about her personal life (including talk of her own Summer 2010 commitment ceremony with Keri) "off the floor." In addition, employees who shared Flood's job title were routinely permitted to take time off the phone to attend meetings of the Bank's various affinity groups. In late July or early August 2010,

however, Castle told Flood that she could no longer take time off to attend the LGBT affinity group meetings.

The most overt conflict between Flood and Castle occurred when Castle offered Flood certain advice, ostensibly to help Flood attain her goal of becoming a manager. Brief social visits from co-workers or partners were not uncommon at the call center. But in late July or early August 2010, Castle told Flood that, for "perception" purposes, it was "not a good idea to have [her] girlfriend hanging at [her] desk." Castle added that it would be better for Keri to hear it from Flood than from Keri's boss, a statement Flood interpreted as a threat to contact Keri's supervisor at ABM. Although Flood and Keri kept their distance at work after that, Castle still complained to ABM's liaison at the Bank, and Keri received a verbal warning from ABM later that August. In addition, Tabbutt would stand up and watch Flood and Keri whenever Keri's work brought her in Flood's vicinity.

Flood, upset, contacted Castle's supervisor, Brian King, and asked if she should report harassment to the Bank's Advice & Counsel Department. King said no, and instead arranged a meeting with Castle and Flood in which he told Castle she would no longer be Flood's mentor, that Castle should not have relayed her concern about Keri through the ABM liaison, and that Castle should contact ABM to apologize. After this meeting, Keri nevertheless received a written memorialization of her verbal warning from ABM.

-5-

Events seemed to escalate from there. In August 2010, Castle demanded, in Flood's presence, that Treneer give Flood a verbal warning for an error on Flood's loan review sheet, and Treneer did so. The error had been on Flood's review sheet for two weeks and had gone unmentioned. Furthermore, Flood was easily able to prove she had nothing to do with the account and that the error should not have been attributed to her.

That same month, Flood received a positive mid-year review from Treneer.[1] Nevertheless, she received a written "verbal warning" on September 7 for failure to meet her productivity goals in April, June, and July. Flood had thought that she had met her productivity goals for those months because Tabbutt had pre-approved a number of off-the-phone ("aux") hours, which would be credited as productive time in the calculation of Flood's productivity levels. However, in September, Castle retroactively reclassified a number of those hours from productive to unproductive, reducing Flood's efficiency statistics and resulting in the warning. In order to issue the warning, Castle also contacted the Bank's Advice & Counsel Department and told them that Flood had received a prior warning in June; there is, however, no evidence in the record of a June warning. The September warning

---

[1] Although the evaluation was positive overall, Treneer noted in at least two places that Flood needed to improve her efficiency.

threatened that failure to meet expectations could lead to termination.

After receiving the written "verbal warning," and with Treneer's approval, Flood began applying for positions in other departments at the Bank. But Castle contacted at least one recruiter to say that Flood had trouble meeting her current goals and was not ready for more responsibility.

On September 21, Flood learned that Tabbutt had once again rated one of her calls "does not meet." Flood believed she was being held to a higher standard than other Senior Credit Analysts and that she would soon be fired. Later that day, there was a team meeting with Tabbutt to discuss goals for the month. After the meeting, conversation turned to Tabbutt's bridal shower. The conversation included mention of a penis shot glass, lingerie, testosterone, and a male team member as a "buck" and the females as his "does." Although Flood repeatedly asked to be excused from the conversation, Tabbutt told Flood that she could "deal." Flood felt that Tabbutt was flaunting the fact that Flood was not permitted to discuss her own personal life at work.

After the crude conversation, Flood felt she could take no more. She came to work on September 22 to wrap up certain matters and did not come back. Tabbutt and Castle each called Flood on the telephone, but Flood felt too distraught to answer. Treneer sent Flood a letter on September 27 saying that he would

assume she had voluntarily resigned if he did not hear from her in three days.  On September 30, Flood sent a letter to Castle explaining that she believed she had been treated differently because of her sexual orientation and conveying the emotional toll it had taken on her.  In early October, Flood saw on her computer that she had been terminated for having abandoned her job.  Throughout October, Flood and members of the Bank's Human Resources Department left phone messages for each other, but never connected.  On November 4, the Bank sent Flood a letter "to inform [her] that [her] employment was terminated on October 1, 2010 for Voluntary Job Abandonment."

Flood filed discrimination charges against the Bank with the Maine Human Rights Commission ("MHRC"), which issued her a right to sue letter.  She then brought suit against the Bank in the Maine Superior Court alleging (a) employment discrimination in violation of the MHRA and (b) defamation under Maine common law.  The case was removed to federal court on the basis of diversity jurisdiction.  After discovery, the Bank moved for summary judgment.  In a lengthy decision, the magistrate judge issued a recommendation to grant the motion and the district court affirmed the recommendation summarily.  This appeal followed.[2]

---

[2] This appeal only concerns Flood's claims because Keri has settled all of her claims.  We therefore treat Flood as if she had been the sole plaintiff and confine our discussion of Keri's case to a brief summary.  Castle reported to various Bank security personnel that Keri had been physically bumping into a pregnant

We review the district court's grant of summary judgment de novo.  Hicks v. Johnson, 755 F.3d 738, 743 (1st Cir. 2014). Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine dispute is one that a reasonable fact-finder could resolve in favor of either party and a material fact is one that could affect the outcome of the case.  Gerald v. Univ. of P.R., 707 F.3d 7, 16 (1st Cir. 2013).  A party's assertion that a fact is or is not genuinely disputed must be supported by citing to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  In deciding whether there is a genuine dispute about a material fact, we view the record "in the light most favorable to the nonmoving party, drawing all reasonable

_____

Bank associate in the halls and that Keri attempted to trip the associate in a stairwell with a vacuum cord.  The Belfast branch's protective services manager investigated the claim.  He knew Keri and had not known her to behave in such a manner.  Neither did video footage of the stairwell corroborate what Castle had reported.  But the protective services manager interviewed the associate in question, who repeated Castle's story, and he found the associate credible.  The manager then contacted ABM and asked that Keri be reassigned, away from the Belfast facility.  Instead, ABM terminated Keri's employment.  Keri sued the Bank for defamation and for tortiously interfering with her employment at ABM.  Both claims survived summary judgment; Keri and the Bank subsequently settled.

inferences in that party's favor."  Martinez-Burgos, 656 F.3d at 11.

## A. Employment Discrimination Claim

Flood advances several theories of employment discrimination on the basis of her sexual orientation: (1) she was discharged; (2) she was subject to a hostile work environment; (3) she was not promoted; (4) she received an undue warning; and (5) she endured matters that, in the aggregate, amount to unlawful employment discrimination under the MHRA.  We focus on the discharge and hostile work environment claims, concluding that we must vacate the district court's rejection of those claims.  We will explain summarily our affirmance of the district court's rejection of her other discrimination claims.

### 1. Discharge

Flood contends that the district court misconstrued her discharge claim when the court analyzed her claim under a constructive discharge rubric.  See Flood v. Bank of Am. Corp., No. 1:12-CV-00105-GZS, 2013 WL 4806863, at *9 (D. Me. Sept. 9, 2013). A claimant asserting constructive discharge must meet a heavy burden to show she had "no reasonable alternative to resignation because of intolerable working conditions," King v. Bangor Fed. Credit Union, 611 A.2d 80, 82 (Me. 1992).  The district court determined that Flood could not carry that burden on these facts.

But Flood argues she did not resign and, consequently, she was never asserting constructive discharge.

We agree that the district court misconstrued Flood's claim. Her argument below was the same as it is on appeal: the Bank used job abandonment as a pretext for improperly terminating her employment.[3] Focusing on Flood's termination, summary judgment was inappropriate because a reasonable fact-finder could determine that job abandonment was a pretext, and the Bank actually fired Flood because of her sexual orientation.

The MHRA makes it unlawful for an employer to discharge an employee on the basis of, inter alia, sexual orientation.[4] Me. Rev. Stat. Ann. tit. 5, § 4572(1)(A). In an employee's claim for disparate treatment, "liability depends on whether the protected trait . . . actually motivated the employer's decision." Hazen

---

[3] In Flood's opposition to summary judgment, she wrote, "Finally, the Bank terminated Shelly's employment. There can be no employment action more adverse than termination. Though the Bank may insist that the termination was for 'job abandonment,' that claim merely goes to the employer's burden of producing a non-discriminatory reason for the adverse action [under the three-part McDonnell Douglas framework]." DE 63 at 8.

[4] By closely tracking federal employment discrimination law, the Maine legislature "intended the courts to look to the federal case law to provide significant guidance in the construction of [the MHRA]." Me. Human Rights Comm'n v. City of Auburn, 408 A.2d 1253, 1261 (Me. 1979) (internal quotation marks omitted). We therefore properly look to federal precedent when analyzing claims arising under clauses of the MHRA that, like the discharge clause, have counterparts in federal law. Compare 42 U.S.C. § 2000e-2(a)(1) (prohibiting discriminatory discharge), with Me. Rev. Stat. Ann. tit. 5, § 4572(1)(A) (same).

<u>Paper Co.</u> v. <u>Biggins</u>, 507 U.S. 604, 610 (1993). In the absence of direct evidence of discrimination, we evaluate the claim using the three-step burden-shifting framework articulated in <u>McDonnell Douglas Corp.</u> v. <u>Green</u>, 411 U.S. 792, 802-05 (1973). <u>See</u> <u>Me. Human Rights Comm'n</u> v. <u>City of Auburn</u>, 408 A.2d 1253, 1261-62 (Me. 1979) (adopting the <u>McDonnell Douglas</u> methodology). Under this framework, the employee must present prima facie evidence of unlawful employment discrimination. The burden of production then shifts to the employer, who must rebut with a legitimate, non-discriminatory reason for the adverse employment action identified in the employee's prima facie case. Finally, the burden shifts back to the employee, who must produce evidence that the employer's explanation is pretextual. <u>See</u> <u>Fuhrmann</u> v. <u>Staples Office Superstore E., Inc.</u>, 58 A.3d 1083, 1089 (Me. 2012).

In this case, we will move directly to the heart of the matter. <u>See</u> <u>Gómez-González</u> v. <u>Rural Opportunities, Inc.</u>, 626 F.3d 654, 662 (1st Cir. 2010) ("[O]n summary judgment . . . a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus." (quoting <u>Fennell</u> v. <u>First Step Designs, Ltd.</u>, 83 F.3d 526, 535 (1st Cir. 1996))).[5] We determine whether

---

[5] Flood easily establishes a prima facie case for unlawful termination. An employee satisfies her initial prima facie burden by showing (1) she is a member of a protected class; (2) she

Flood has made a sufficient showing of pretext by asking whether a reasonable jury could conclude that the Bank: (1) knew Flood did not abandon her job, and (2) fired Flood because of her sexual orientation.

### a. The Bank Knew Flood Did Not Abandon Her Job

There is sufficient evidence for a reasonable fact-finder to conclude that the Bank knew Flood had not abandoned her job. Admittedly, Flood was warned to contact Treneer within three days of his September 27 letter, or he would "assume that . . . [she had] voluntarily resigned." Although Flood failed to contact him, she did send a letter to his superior, Castle, within that three-day window, which launched an investigation at the Bank.[6] A reasonable jury could determine that the Bank treated Flood's letter to Castle as satisfying Treneer's instruction to contact him, thus removing the presumption that she had resigned. Such a determination would be particularly reasonable in light of the

___

satisfied the employer's legitimate job performance expectations; (3) she was subject to an adverse employment action; and (4) the action was based in whole or in part on her membership in a protected class. See Daniels v. Narraguagus Bay Health Care Facility, 45 A.3d 722, 726 (Me. 2012) (setting forth the elements of a prima facie case for employment discrimination based on disability). The Bank does not dispute that Flood satisfies the first two prongs, and termination is clearly an adverse employment action. Our discussion below, concerning Flood's ultimate burden, coextensively demonstrates why Flood satisfies the fourth prong of her prima facie case. The Bank's rebuttal is captured in its assertion that Flood was terminated for having abandoned her job.

[6] Castle testified that she read the letter and then reported it to her manager and the Bank's Advice & Counsel Department.

-13-

Bank's own assertion, reiterated at oral argument, that Flood's employment was not severed until November 4.

In addition, Flood wrote in her letter to Castle that she had "attempted to make the drive into work several times" during the final week of September 2010, but she could not "bring [herself] to make the trip completely [because] the anxiety was to[o] great." She also explained in the letter that she saw her employment with the Bank as "[her] career" and more than "just a job." Taken together, the evidence could reasonably support a finding that the Bank knew Flood intended to return to work.

### b. Discriminatory Animus

The magistrate judge explicitly found that the evidence would support a finding of discriminatory animus, and explained that Flood's claims would have survived summary judgment if there had been an adverse employment action (such as discharge). See Flood, 2013 WL 4806863, at *12-14. We agree with the magistrate judge: the evidence would permit a reasonable jury to conclude that Castle harbored animosity toward Flood because of Flood's sexual orientation and that Castle undermined Flood's work performance for that reason.

There are several bases for this conclusion in the summary judgment record. Flood's relationship with Keri became a point of tension and conflict in Flood's relationship with Castle. After Castle learned that Flood was bisexual, Castle began giving

-14-

Flood cold stares and making disparaging comments about Flood's eating habits, dress, and hair style. In addition, Castle advised Flood to keep her girlfriend away from her desk during working hours if she wanted to become management and, even though Flood and Keri complied, Castle contacted Keri's supervisor and Keri received a reprimand. A jury might buttress the conclusion that Castle harbored animus toward Flood based on her sexual orientation by crediting Flood's assertion that Castle reacted negatively when she saw the photo of Flood and Keri on display at the Bank's April event.

A reasonable jury could also find that, as the magistrate judge wrote, Castle "took affirmative measures to undermine aspects of . . . Flood's employment . . . [and was] setting up [Flood] for termination." Id. at *14. After Flood complained to Castle's supervisor, "Castle wrongly demanded that one of Shelly's team leaders place Shelly on verbal warning for something that Shelly was readily able to show was not her responsibility." Id. at *12. In addition, Castle retroactively reclassified "aux" hours that Flood's team leader had approved so that Flood's productivity levels would fall below expectations. Castle also misrepresented the existence of a June 2010 verbal warning, enabling her to issue a September 2010 verbal warning (reduced to writing) about efficiency that threatened Flood with termination if her productivity did not improve. As the magistrate judge wrote, the

-15-

evidence "could support an inferential finding that the [efficiency] basis for the negative evaluation was false or was being manipulated by Castle . . . [because she] harbored animus toward Shelly based on Shelly's sexual orientation." Id. at *14.

Finally, we would add to the magistrate judge's analysis that Castle played at least some role in Flood's actual discharge. Although Castle did not personally discharge Flood, Castle testified that she recommended to Advice & Counsel that they follow the procedures for job abandonment, a procedure Castle knew could end in termination if Flood did not return to work. On the basis of this evidence, a reasonable fact-finder could conclude that the Bank's explanation for firing Flood was pretextual and that she was actually fired because of her sexual orientation. Summary judgment was therefore inappropriate on the discharge claim.

## 2. Hostile Work Environment

Flood also argues that the district court erred when it held that the harassment she alleged was not sufficiently severe or pervasive to sustain a hostile work environment claim. The MHRA makes it unlawful for an employer to "discriminate with respect to . . . terms, conditions or privileges of employment." Me. Rev. Stat. Ann. tit. 5, § 4572(1)(A). That provision, in turn, authorizes a claim for hostile work environment. See 94-348-003 Me. Code R. § 10(1)(C) (Maine Human Rights Commission regulations); Watt v. UniFirst Corp., 969 A.2d 897, 902 (Me. 2009).

-16-

To prevail on such a claim, the plaintiff must show: (1) she is a member of a protected class; (2) she was subject to harassment; (3) the harassment was based on her membership in a protected class; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive work environment; (5) the harassment was both objectively and subjectively offensive; and (6) there exists some basis for employer liability. Watt, 969 A.2d at 903; see Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 228 (1st Cir. 2007). The Bank insists Flood cannot satisfy the third and fourth prongs.[7]

**a. Harassment Was Based on Flood's Sexual Orientation**

The Bank insists that the alleged acts of harassment were not based on Flood's sexual orientation, observing that she was not exposed to explicitly homophobic statements or derogatory remarks. Such an argument requires too much of the plaintiff. Fortunately, co-workers and supervisors increasingly know better than to spew explicitly racist, misogynist, xenophobic or homophobic remarks in the workplace. But the absence of such blatant vitriol does not doom a claim of discrimination. Discriminatory conduct unlawfully based on one's membership in a protected class need not be overt to be actionable. O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001); see Rosario v. Dep't of Army, 607 F.3d 241, 247

---

[7] The Bank neither concedes nor contests the other elements.

-17-

(1st Cir. 2010) (citing O'Rourke for the proposition that sexual harassment "need not be overtly sexual in nature").

The magistrate judge addressed, see Flood, 2013 WL 4806863, at *12-14, and we have discussed in the previous section, how a reasonable jury could conclude that Castle was motivated by animus toward Flood based on Flood's sexual orientation. While Castle is the primary antagonist in this case, Flood also alleges that she endured harassment at the hands of another supervisor, Tabbutt, who allegedly stood up to observe Flood and Keri whenever Keri's work brought her near Flood. Tabbutt also compelled Flood to endure a crude conversation about Tabbutt's bridal shower, which included references to a male team member as a "buck" and the females as his "does." Although Flood "became very uncomfortable and repeatedly asked to be excused," Tabbutt told Flood to "deal." According to Flood, "Tabbutt was rubbing my nose in the fact that all other Bank employees could discuss their love lives during working hours and engage in sexual banter in graphic terms, but I was not allowed to mention my relationship with another woman or even to be seen with her during working hours." And it was Tabbutt who, immediately after Castle discovered that Flood was bisexual, "became more critical of Shelly's call performance." Id. at *12. A reasonable fact-finder could conclude that Tabbutt, like Castle, was harassing Flood because of Flood's sexual orientation.

### b. Harassment Was Sufficiently Pervasive

Whether harassment is sufficiently severe or pervasive to alter the conditions of one's employment "is not . . . a mathematically precise test" and it "can be determined only by looking at all the circumstances."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 22-23 (1993); see Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 83 (1st Cir. 2006) (stating that an evaluation of the severity and pervasiveness of conduct requires an "examin[ation of] all the attendant circumstances"); Noviello v. City of Bos., 398 F.3d 76, 92 (1st Cir. 2005) ("In determining whether a reasonable person would find particular conduct hostile or abusive, a court must mull the totality of the circumstances.").

Pervasiveness and severity are questions of fact. "[S]ubject to some policing at the outer bounds, it is for the jury to . . . decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment."  Rosario, 607 F.3d at 247 (internal quotation marks omitted).  The jury may consider, among an open list of factors: whether the conduct was "physically threatening or humiliating, or a mere offensive utterance; . . . whether it unreasonably interfere[d] with an employee's work performance"; and whether (and to what extent) the conduct affected the employee psychologically.  Harris, 510 U.S. at 23.

While "the conduct may be both [severe and pervasive], only one of the qualities must be proved in order to prevail.  The severity . . . may vary inversely with its pervasiveness."  Nadeau v. Rainbow Rugs, Inc., 675 A.2d 973, 976 (Me. 1996).  We have upheld hostile work environment claims where harassment has been more pervasive than severe.  See, e.g., Arrieta-Colon v. Wal-Mart P.R., Inc., 434 F.3d 75, 89 (1st Cir. 2006) (upholding jury verdict of hostile work environment where "harassment was constant and unbearable, leading to [the plaintiff's] resignation; and there was evidence that [the plaintiff's] supervisors knew about the harassing conduct and rather than stop it, participated in it"); Marrero v. Goya of P.R., Inc., 304 F.3d 7, 19 (1st Cir. 2002) (upholding jury verdict of hostile work environment where harassment was "more or less constant . . . [as] distinguished from . . . comments that are few and far between"); White v. N.H. Dep't of Corr., 221 F.3d 254, 260 (1st Cir. 2000) (upholding jury verdict of hostile work environment where "disgusting comments . . . occurred everyday [sic]" (internal quotation marks omitted)).[8]

Nevertheless, the harassment must pass a certain threshold of severity.  Offhand comments and a tense or

---

[8] The Bank's assertion that Flood's claim must fail because the alleged harassment only took place over a period of four or five months mistakes the notion of pervasiveness with that of duration.  We do not read the applicable precedent to require hostile conditions to persist for any particular bright line period of time before a hostile work environment claim will lie.

uncomfortable working relationship with one's supervisor are, without more, insufficient to support a hostile work environment claim. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998); Colón-Fontánez v. Municipality of San Juan, 660 F.3d 17, 44 (1st Cir. 2011). Indeed, "[t]he workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins." Marrero, 304 F.3d at 19 (quoting Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000)).

Here, Flood has made out a genuine issue of material fact as to the existence of harassment that is both pervasive and above the threshold of merely offensive comments. The evidence includes atmospheric and job performance-related incidents, both of which may support the hostile work environment claim. See id. at 28 ("[A]n act of harassment that is not actionable in and of itself may form part of a hostile work environment claim."). Viewed in their totality, as they must be, a reasonable jury could find that these incidents altered the conditions of Flood's employment. See Harris, 510 U.S. at 23 ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances."); Noviello, 398 F.3d at 92 (describing the hostile work environment analysis as an evaluation of "the totality of the circumstances").

In discussing the discriminatory animus linked to Flood's discharge claim, we have already noted many of the atmospheric

incidents relevant to her hostile work environment claim: Castle's demeanor shifting when she learned Flood was bisexual; Tabbutt standing to watch whenever Keri approached Flood; Castle instructing Flood to keep Keri away from her desk for "perception" purposes; Flood being instructed not to discuss her personal life at work, even though other employees, including her supervisor, were permitted to do so -- behaviors conveying that Flood's relationship with Keri was under the constant and disapproving scrutiny of her supervisors. In addition, Castle did not allow Flood to take time away from the phone to attend LGBT affinity group meetings, even though other employees were allowed to attend similar types of meetings. A reasonable jury could also consider the crude conversation to which Tabbutt subjected Flood and determine that it rose above "a mere offensive utterance" and was, in fact, "humiliating" to her. Harris, 510 U.S. at 23.

We have also noted in discussing Flood's discharge claim incidents involving the evaluation of her work which are relevant to her hostile work environment claim. She alleges that her work performance was unduly criticized, that Castle urged Treneer to reprimand her for a mistake she did not make, and that Castle retroactively manipulated the classification of her hours so that her performance fell below expectations and she received a verbal warning reduced to writing. Again, under a totality of the circumstances analysis, a jury could consider those incidents as

-22-

prominent points in an underlying pattern of hostility. See Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49, 55–56 (1st Cir. 2000) (holding that the plaintiff's case survived summary judgment where two specific instances of offensive conduct were only the most notorious in a pattern of such conduct).

Hence, on these facts, we are unwilling to say that Flood's hostile work environment claim fails as a matter of law. To the contrary, a reasonable jury could find Flood had endured sufficiently pervasive harassment to alter the conditions of her employment.[9]

## B. Defamation Claims

Flood's defamation claims are a simpler matter. They entered the case by way of a motion for leave to amend her complaint. In partially granting and partially denying that leave,

---

[9] We briefly address Flood's three remaining discrimination claims. First, Flood's failure to promote claim fails because she only established the first of four elements in a prima facie case for failure to promote, namely, membership in a protected class. See Lakshman v. Univ. of Me. Sys., 328 F. Supp. 2d 92, 117 (D. Me. 2004) (explaining that a plaintiff establishes a prima facie case for failure to promote by showing: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was not hired despite her qualifications; and (4) the job was given to someone outside the protected class). Second, having already considered the September 2010 warning in the context of Flood's hostile work environment claim, we decline to consider it as an independent basis for a claim of discrimination. Finally, Flood contends that the Bank's actions are adverse in the aggregate and consequently actionable under the "any other matter" clause of the MHRA. See Me. Rev. Stat. Ann. tit. 5, § 4572(1)(A). Here, however, our treatment of the hostile work environment claim makes it unnecessary for us to address this state law issue.

the magistrate judge wrote, "[T]he only statement [Flood] has argued with the required specificity is the statement relating to her claim of self-publication regarding job abandonment. . . . Her claim is limited . . . to just that portion of her defamation claim."[10]  Flood did not object to that order.  Although she argued below that the Bank defamed her within its own organization and to the Maine Human Rights Commission, the district court held that Flood failed to preserve those claims because she failed to object to the magistrate judge's order.  We agree: the magistrate judge's order clearly limited Flood's defamation claims to a self-publication theory, and Flood's failure to object to that order below is fatal to her third-party publication theory on appeal.  See Garayalde-Rijos v. Municipality of Carolina, 747 F.3d 15, 22 (1st Cir. 2014) ("[F]ailure to assert a specific objection to [the R & R] [has] irretrievably waive[d] any right to review by the district court and th[is] court of appeals." (quoting Cortés-Rivera v. Dep't of Corr. & Rehab. of P.R., 626 F.3d 21, 27 (1st Cir.

_____

[10] Flood's two theories of defamation each concerned the allegedly defamatory information that she abandoned her job.  On one theory, the Bank published that information (third-party publication); on the other, Flood was compelled to publish it herself (self-publication).  Compare Cole v. Chandler, 752 A.2d 1189, 1193 (Me. 2000) (setting forth the elements of defamation, including "a false and defamatory statement concerning another"), with Carey v. Mt. Desert Island Hosp., 910 F. Supp. 7, 13 (D. Me. 1995) (holding that Maine would recognize a claim for compelled self-publication).

2010))). The defamation claim rooted in third-party publication was not preserved for our review.

As to defamation under a compelled self-publication theory, Flood has waived that claim here by providing no factual support for it and by failing to identify any specific error of law made below. The district court disposed of this issue quickly: "[T]here is no need to delve into that theory of the case. Shelly Flood has not presented any actual evidence of self-publication." Flood, 2013 WL 4806863, at *16. The same is true on appeal. The claim for defamation by compelled self-publication is waived. See Carreras v. Sajo, García & Partners, 596 F.3d 25, 32 n.5 (1st Cir. 2010) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quoting United States v. Rivera Calderón, 578 F.3d 78, 94 n.4 (1st Cir. 2009))).

## III.

For the reasons stated, we vacate the grant of summary judgment on the discharge and hostile work environment portions of Flood's MHRA employment discrimination claim and remand for further proceedings consistent with this opinion. We affirm the grant of summary judgment on the balance of Flood's discrimination claim, as well as on her defamation claims. Each party shall bear its own costs.

So ordered.