# United States Court of Appeals
## For the First Circuit

No. 17-1191

MARTINA RIVERA-RIVERA,

Plaintiff, Appellant,

v.

MEDINA & MEDINA, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Howard, Chief Judge,
Lipez and Thompson, Circuit Judges.

Anibal Escanellas-Rivera, with whom Escanella & Juan, PSC was on brief, for appellant.
Julio I. Lugo Muñoz, with whom Jaime Sifre Rodriguez and Sanchez Betances, Sifre & Muñoz Noya, PSC were on brief, for appellee.

August 1, 2018

**THOMPSON**, **Circuit Judge**.  When it comes to evaluating summary judgment motions, judges simply aren't meant to be factfinders.  In what should come as a surprise to no one, then, courts should never be in the business of granting such motions when the case's material facts are genuinely disputed by the parties.  But for some of the claims in this employment discrimination lawsuit, the district court did just that.  Though we recognize the lower court here didn't get it all wrong, it nevertheless disposed of numerous claims that should have been spared the summary judgment ax.  We therefore affirm in part and reverse in part the grant of summary judgment below.

## A. Getting Our Factual Bearings

The facts of this case (which are not particularly complicated) are recounted here in the light most favorable to Martina Rivera-Rivera ("Rivera"), the non-moving party, as is required when reviewing an order granting summary judgment.  See Del Valle-Santana v. Servicios Legales de Puerto Rico, Inc., 804 F.3d 127, 128 (1st Cir. 2015).

In 2006, Rivera was recruited to work for Medina & Medina, Inc. ("Medina"), a Puerto Rico company owned and operated by Pepín and Eduardo Medina ("Pepín" and "Eduardo").  Rivera, who had been interviewed by Medina's general manager, Lizette Cortés, was ultimately hired to be Medina's marketing manager.  At the time, she was forty-six years old.

Rivera maintained employment at Medina from 2006 until 2013, at which point she resigned. Initially, Rivera was paid $600 per week by the company, but, in 2008, she was given a raise so that she made $700 weekly. In 2009, Rivera received another wage increase and began to be paid $750 a week from that point up through 2012. Finally, in 2013, Rivera's pay increased once more to $800 per week. None of these salary increases occurred at Rivera's prompting. Additionally, Rivera received a discretionary "gratification bonus" from Medina at the end of each year she worked for the company (with the exception of 2013, apparently due to the number of absences she racked up that year).

Throughout Rivera's time with Medina, she asserts that although she performed the functions of marketing manager, she also assumed responsibilities that would otherwise be more properly classified as duties meant for the company's key account manager. Indeed, Rivera maintains that she performed many of the exact same duties held by three particular individuals who at various times during Rivera's tenure were employed as Medina's key account manager. These employees were Jaime Bou ("Bou"), Frank Bravo ("Bravo"), and Wilfredo Santiago ("Santiago"). According to Rivera, these other individuals--who were all males--made more money than she did for substantially the same work.

Beginning in 2011, Rivera says that she began experiencing harassment at the hands of her superiors. As she

tells it, Eduardo, Pepín, and Cortés began berating her about her age on a daily or near-daily basis. Specifically, Rivera claims the following types of comments permeated her work environment: (1) she was told that she was "vieja"--Spanish for old--and, as a result, that she was "useless" and "worthless"; (2) she was chastised for supposedly lacking the skills necessary to adequately fulfill the roles of her job because her age rendered her "slow"; (3) she was told that given her age, she should seek social security benefits; and (4) there were suggestions that because she was perceived as being too old for the job, she should resign before being forcibly discharged by the company.

Moreover, both Eduardo and Pepín yelled, screamed, and made physically threatening gestures at Rivera, which made her fearful for her safety. Such aggressive and insulting behavior was not exhibited toward Rivera's male colleagues.[1]

On August 16, 2013, Rivera went on sick leave as a result of the stress and depression caused by her working environment. While on sick leave, Rivera filed a Charge of Discrimination with the Puerto Rico Department of Labor Antidiscrimination Unit ("ADU"), as well as a similar charge with the Equal Employment Opportunity Commission ("EEOC") alleging that she suffered from

---

[1] We note that Medina disputes that any of this harassing behavior occurred whatsoever. But, as explained above, we are reciting the facts here in the way that most favors Rivera.

age, sex, and gender discrimination. Rivera's lawyer also sent a letter to Medina on August 21, 2013 informing the company that such charges had been filed.

Upon returning to work on August 23, 2013, Rivera claims she was immediately subjected to even more abuse.[2] Not only was she shouted at as she had been prior to going on sick leave, but she was directly threatened for the first time with termination due, specifically, to the discrimination charges filed with the ADU and EEOC. Such threats occurred daily until Rivera again went out on sick leave on August 26, 2013. During this second sick leave, Rivera was seen by a psychiatrist, Dr. Hector M. Cott Dorta, to whom she complained of depression based on her working conditions (including, specifically, her anxiety over Pepín and Eduardo's alleged screaming). This sick leave lasted through September 24, 2013.

Though Rivera again returned to work after her second leave of absence, her time with the company did not last much longer. Indeed, because the harassment directed at her did not dissipate and because she was constantly threatened with discharge due to the discrimination filings, Rivera ultimately resigned from the company on November 1, 2013. This resignation was endorsed by Dr. Cott Dorta, who concluded that the "abuse and hostile

---

[2] Again, Medina disputes this.

environment in the workplace . . . produce[d] exacerbation of her symptoms [of depression]."  He thus "recommended that [Rivera not] continue with [her] current job."

## B. Procedural History

After receiving a notice of right to sue from the ADU and EEOC, Rivera brought this federal lawsuit in December 2013 against Medina alleging violations of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, et seq. ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.* ("ADEA"), as well as supplemental claims brought pursuant to Puerto Rico law.  These claims charged discrimination based on age (due to the supposed differential in pay between Rivera and her younger male colleagues), hostile work environment (due to age and gender), and retaliation.[3]

On March 27, 2015, Medina moved for summary judgment on all claims against it.  And almost two years later, the district court granted that motion, concluding that Rivera's claims of substantive discrimination, hostile work environment, and retaliation had to be thrown out.  In its ruling, the court first

---

[3] On three separate occasions more than a year after initiating this suit (on January 20, February 4, and February 23 of 2015), Rivera attempted to amend her complaint to add two additional causes of action under the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. § 1162 ("COBRA"), and the Equal Pay Act, 29 U.S.C. § 206.  Each time, however, the district court denied the motion to amend.  Rivera did not appeal any of these denials to us.

did away with Rivera's discrimination claim based on disparate wages, concluding that she had failed to actually produce any evidence whatsoever that showed any inequity in pay existed between her and similarly situated male colleagues.

Next, in siding with Medina on the age and gender-based hostile work environment claims, the lower court made much ado about the particular evidence Rivera had presented, concluding that the record failed to provide the level of specificity necessary to back up her causes of action. The district court explained that Rivera (whose opposition to summary judgment on these claims rested exclusively on statements contained in her own "self-serving"--the district court's words, not ours--affidavit) did not "provid[e] specific factual information made on the basis of personal knowledge" that would allow for her hostile work environment claims to move onward to trial. Rivera-Rivera v. Medina & Medina, Inc., 229 F. Supp. 3d 117, 125 (D.P.R. 2017) (quoting Velázquez-García v. Horizon Lines Of P.R., Inc., 473 F.3d 11, 17-18 (1st Cir. 2007)). The court suggested that Rivera's affidavit did nothing more than repeat "conclusory allegations" otherwise found in the complaint, Rivera-Rivera, 229 F. Supp. 3d at 121, and that she failed to "provid[e] context, specific dates, the precise words used, or nam[e] the specific [people] involved in each instance" of allegedly discriminatory and harassing behavior, id. at 125. The court also explained that to the extent

the derogatory, age-based comments Rivera's supervisors allegedly made toward her (i.e. calling her "vieja," "worthless," "slow," etc.) were truly hurled at Rivera, such language was "too mild to form the basis of a hostile work environment claim." Id. (quoting Villegas-Reyes v. Universidad Interamericana de P.R., 476 F. Supp. 2d 84, 91 (D.P.R. 2007)).

The court then ruled that Rivera's retaliation claim was similarly doomed. Like the hostile work environment cause of action, Rivera's only piece of evidence presented to support her claim of retaliation was her sworn declaration. And just as the court had determined that the declaration was deficient for lack of specificity in the hostile work environment context, so too did it conclude that it could not be used to adequately support her charge of retaliation.

Finally, the district judge exercised supplemental jurisdiction over Rivera's various claims sounding in Puerto Rico law and, determining that the requisite elements of each were more or less coterminous with their federal counterparts, dismissed them for the same reasons outlined above.

Rivera timely appealed and now it is our turn to take a crack at this case.

## C. Standard of Review

We review a district court's grant of summary judgment de novo. Johnson v. Univ. of P.R., 714 F.3d 48, 52 (1st Cir.

2013).  In doing so, we must keep in mind that granting summary judgment is only proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 68 (1st Cir. 2015) (citation omitted).  "Facts are material when they have the 'potential to affect the outcome of the suit under the applicable law.'"  Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).  And "[a] dispute is 'genuine' if 'the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party,' [here, Rivera]."  Id. at 23-24 (citation omitted).  Where a genuine dispute of material facts exists, such a dispute must "be resolved by a trier of fact," not by a court on summary judgment.  Kelley v. LaForce, 288 F.3d 1, 9 (1st Cir. 2002).  We do note, however, that while we resolve all reasonable inferences in favor of Rivera, we must nevertheless "ignore 'conclusory allegations, improbable inferences, and unsupported speculation.'"  Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir. 2008) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

## D. Analysis

As noted above, Rivera brought both federal and Puerto Rico anti-discrimination claims against Medina. To keep everything clear, we first make our way through the federal issues (starting with her Title VII disparate treatment discrimination claim, moving on to her hostile work environment causes of action, and then ending with her theories of retaliation). Once done traversing through the federal law, we take a very quick pit stop at the Commonwealth claims. Finally, we wrap it all up and kick this case back to the district court so it can move forward for further proceedings on the reinstated claims.

## 1. Discrimination

We begin with some brief background on Title VII, the federal statute under which Rivera brings her discriminatory disparate wages claim.[4] Under Title VII, an employer may not "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1). In

---

[4] We note that while Rivera brought hostile work environment and retaliation claims under the ADEA, she failed to argue at the district court that the ADEA was applicable to her more narrow disparate wages discrimination claim. Thus, to the extent that Rivera grounds her wage discrimination claim in both Title VII and the ADEA on appeal, we deem the ADEA theory waived. See CMM Cable Rep Inc. v. Ocean Coast Props., Inc., 97 F.3d 1504, 1525-26 (1st Cir. 1996).

demonstrating that one has been discriminated against because of sex, it is not always easy for plaintiffs like Rivera to supply courts with direct proof of their supposed plights. In other words, we are mindful of the fact that plaintiffs seldom bear "'smoking gun' evidence to prove their employers' discriminatory motivations." Vélez v. Thermo King de P.R., Inc., 585 F.3d 441, 446 (1st Cir. 2009) ("Thermo King") (quoting Arroyo-Audifred v. Verizon Wireless, Inc., 527 F.3d 215, 218-19 (1st Cir. 2008)); see also Lockridge v. Univ. of Maine Sys., 597 F.3d 464, 470 (1st Cir. 2010); Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 171 n.13 (1st Cir. 1998) (explaining that "smoking gun" evidence is "rarely found in today's sophisticated employment world" (citation omitted)). Thus, in order to avoid having to jettison every case of alleged employment discrimination due to a plaintiff's lack of "spot-on" evidence, we employ the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to evaluate whether a plaintiff can make out an inferential case of the alleged discrimination. Lockridge, 597 F.3d at 470.

And when it comes to the McDonnell Douglas analysis, a plaintiff must first show that a prima facie case of employment discrimination exists. Under Title VII a prima facie case of discrimination in compensation can be demonstrated where a plaintiff shows "(1) [s]he is a member of a protected class; (2) [s]he met [her] employer's expectations; (3) [s]he suffered

adverse employment action with respect to compensation; and (4) similarly-situated employees outside the protected class received more favorable treatment." Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008). Establishing a prima facie case isn't usually a tough sell. In fact, "[w]e have described the prima facie case as a small showing that is not onerous and is easily made." Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003) (internal quotations and citations omitted).

Moving on to step two, if such a showing can be made, then there is an inference of discrimination and "the burden of production shifts to the defendant to produce evidence 'that the adverse employment actions were taken for a legitimate, nondiscriminatory reason.'" Cham v. Station Operators, Inc., 685 F.3d 87, 94 (1st Cir. 2012) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993)). Assuming the employer can demonstrate such a reason, we then pivot to step three: "[i]f the defendant carries this burden of production, [then] the plaintiff must prove, by a preponderance, that the defendant's explanation is a pretext for unlawful discrimination." Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 221 (1st Cir. 2007). That is to say, at the third step, "the McDonnell Douglas framework 'disappear[s]' and the sole remaining issue is 'discrimination vel non.'" Cham, 685 F.3d at 94 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000)).

"While this framework shifts the burden of production, the burden of persuasion 'remains at all times with the plaintiff.'" Caraballo-Caraballo v. Corr. Admin., 892 F.3d 53, 57 n.4 (1st Cir. 2018) (quoting Mariani-Colón, 511 F.3d at 221).

This brings us to Rivera's discrimination claim. Disparate treatment claims, like the one here, are almost always subject to the McDonnell Douglas burden-shifting analysis outlined above and, therefore, the ball to make out a prima facie case of employment discrimination begins in Rivera's court. See Caraballo-Caraballo, 892 F.3d at 57. Rivera contends that three male colleagues--Bou, Bravo, and Santiago--who, at various points during Rivera's time with Medina, filled the company's role of key account manager, were paid more than her on a weekly basis. To support this assertion, Rivera points us to (as she did the district court) her deposition. There, she explained that she had heard through conversations that the three men made $800 per week. No other evidence, we note, was offered to support this particular cause of action. Rivera then tells us she made less than the men she identified. In fact, in 2007 (when Bou was employed by Medina), she made $600 a week. In 2009 (when Bravo was employed), she made $750 a week. And in 2012 (when Santiago worked for the company), she also made $750 a week. This apparent differential in payment, Rivera suggests, amounts to a prima facie case of discrimination under Title VII.

But there's a rather big problem with the picture painted by Rivera that, we hope, most law students would be able to catch: the evidence she relies upon to support her claim (her deposition testimony) is a classic example of inadmissible hearsay. And "[h]earsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment." Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990). Recognizing this no-no, Rivera tells us in her brief to cut her some slack. She isn't offering the deposition testimony for the truth of the matter, she proclaims. No, she's offering it to demonstrate the fact that her colleagues uttered the $800 figure at all. But this argument doesn't make a whole lot of sense, particularly because Medina presented direct evidence that Bou, Bravo, and Santiago never made $800 per week at all. Indeed, Medina attached to its summary judgment motion (1) the W-2 forms of all employees from 2007 through 2013 and (2) a summary chart prepared by Cortés that summarized the salaries of every Medina employee for the years 2007 until 2013.[5] These documents revealed that--contrary to

---

[5] In her brief, Rivera falsely contended that Medina never attached the W-2 forms of Bou, Bravo, and Santiago to its summary judgment motion. She then filed an appendix with this court that misleadingly left out those documents. Due to this misstep, Medina argues (citing in and out of Circuit cases) we should dismiss the discrimination claim on procedural grounds. We decline Medina's invitation. While it is true we have dismissed appeals on such grounds where the procedural breaches were "[k]nowing and persistent," González-Ríos v. Hewlett Packard PR Co., 749 F.3d 15, 18 (1st Cir. 2014), we have generally refrained from taking such

Rivera's contention--both Bravo and Santiago made $700 a week while employed by Medina--a full $50 less than Rivera made at the same time. And, that Bou made $700--not $800--while working with Medina in 2007. In light of Medina's proffered facts, Rivera needed to provide a direct factual basis for doubting or calling into question the salaries listed on the federal W-2s and summary chart. And the fact that Rivera may have heard someone utter that the men made $800 a week doesn't cut it. If Rivera's deposition testimony were admitted not for the truth of the matter, but simply to demonstrate that someone at Medina supposedly stated the salaries of the men in question were $800/week, then it is, simply put, irrelevant. Contrary to Rivera's contention, the district court did not engage in credibility determinations or give Medina's evidence more weight than it should have. Instead, it properly recognized that Rivera's proffered evidence should not be considered and, therefore, there was no choice but to grant summary

---

a harsh route where the infringements "neither create unfairness to one's adversary nor impair the court's ability to comprehend and scrutinize a party's papers." Rodríguez-Machado v. Shinseki, 700 F.3d 48, 50 (1st Cir. 2012) (internal quotation marks omitted) (quoting Reyes-Garcia v. Rodriguez & Del Valle, Inc., 82 F.3d 11, 15 (1st Cir. 1996)). And although we both find Rivera's error (for lack of a better word) to be untoward and recognize that had it gone uncorrected, it could have affected the fairness of this appeal, we nonetheless note that Rivera did, in fact, file a new appendix with the proper documents once we ordered her to do so. Rivera was not so "persistent[ly] noncomplian[t]" as to justify dismissal, Reyes-Garcia, 82 F.3d at 15, and so we proceed to the merits of this claim.

judgment on the disparate wage issue because Rivera couldn't even satisfy the first step of McDonnell Douglas.[6]  Our de novo review yields the same result.  Based on the evidence proffered by both parties, summary judgment was appropriate.[7]

---

[6] We note that according to the W-2 information provided by Medina, Bou, who overlapped with Rivera in 2007, made $700 a week at a time when Rivera made $600.  Rivera makes no argument in her brief that we should consider this salary differential in assessing whether a prima facie case of gender-based employment discrimination exists.  She relies solely and singularly on her inadmissible deposition testimony in support of her claim.  Consequently, any argument about the disparity between Bou and Rivera's salaries in 2007 is necessarily waived.  See Landrau-Romero v. Banco Popular de P.R., 212 F.3d 607, 616 (1st Cir. 2000) (citing P.R. Tel. Co. v. Telecomm. Regulatory Bd. of P.R., 189 F.3d 1, 17 n.14 (1st Cir. 1999)).  To be clear, though, even if we did presume Rivera had mounted McDonnell Douglas's first hurdle when it comes to the Bou salary differential, Medina has adequately satisfied step two of the McDonnell Douglas analysis by providing nondiscriminatory justifications for Bou's higher salary.  Indeed, in Cortés's sworn declaration, she explained that Bou not only held a job--key account manager--that was different from Rivera's marketing manager position, but that Bou was also higher up in the company hierarchy than Rivera.  Rivera has provided no reason to think this justification is pretextual and, therefore, even if the argument were not waived, it would not succeed here.

[7] In her brief, Rivera makes several references to the district court's supposedly improper dismissal of her Equal Pay Act claim at the summary judgment stage.  These references appear in the same section as her discussion of the disparate treatment cause of action.  Just so everyone is on the same page, the district court never addressed the Equal Pay Act in any capacity at summary judgment.  It didn't need to.  To repeat, Rivera never had an Equal Pay Act claim pending against Medina at any point in this litigation.  Rivera's triple efforts to amend her complaint to assert an Equal Pay Act cause of action got thwarted and she hasn't appealed the denial of those motions.

## 2. Hostile Work Environment

Moving on, Rivera next challenges the district court's dismissal of her hostile work environment claims against Medina, which she brought pursuant to both Title VII and the ADEA. Like Title VII, the ADEA is an anti-discrimination statute, except (unlike Title VII) it specifically prohibits discrimination based on one's age, not on (as relevant to Rivera) sex. Indeed, under the ADEA it is unlawful for an employer to "refuse to hire or to discharge any individual or otherwise discriminate against [her] with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

And hostile work environment is a form of unlawful discrimination barred by both Title VII and the ADEA. See Franchina v. City of Providence, 881 F.3d 32, 45 (1st Cir. 2018) (Title VII); Rivera–Rodríguez v. Frito Lay Snacks Caribbean, 265 F.3d 15, 24 (1st Cir. 2001) (ADEA), abrogated on other grounds by Crowley v. L.L. Bean, Inc., 303 F.3d 387 (1st Cir. 2002). In order to prove a hostile work environment claim, a plaintiff like Rivera must provide sufficient evidence from which a reasonable factfinder could determine that the workplace was "permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of . . . [her] employment and create an abusive working environment."

Quiles-Quiles v. Henderson, 439 F.3d 1, 7 (1st Cir. 2006) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). The offensive conduct, in other words, must be "[(1)] severe [or] pervasive enough to create an objectively hostile or abusive work environment and [(2)] subjectively perceived by the victim as abusive." Rivera-Rodríguez, 265 F.3d at 24 (quoting Landrau-Romero, 212 F.3d at 613). "This is not, and by its nature cannot be, a mathematically precise test." Harris, 510 U.S. at 22. Rather, it "can be determined only by looking at all the circumstances." Id. at 23. These circumstances, we have explained, include (but are not limited to) the following: "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 83 (1st Cir. 2006). In assessing these factors, our job boils down to "distinguish[ing] between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005). "'Subject to some policing at the outer bounds,' it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." Marrero v. Goya of P.R., Inc., 304 F.3d 7, 18-19 (1st Cir. 2002)

(quoting <u>Gorski</u> v. <u>N.H. Dep't of Corrs.</u>, 290 F.3d 466, 474 (1st Cir. 2002)).

### a. Age-Based Hostile Work Environment

We begin with Rivera's hostile work environment claim premised on age-based discrimination.  In support of her cause of action, Rivera presented a sworn statement in which she attested to the fact that, on a daily or near daily basis, she was subjected to abusive comments about her age by Cortés (who, remember, was Medina's general manager), as well as by Pepín and Eduardo Medina (the owners of the company).  According to Rivera's statement-- made under penalty of perjury, mind you--she was called "vieja" and told her age made her "useless" and "worthless"; she was excoriated for being "old" and "slow"; and she even was told she should seek out social security benefits and resign before getting terminated because her age interfered with the functions and duties of her job.

The district court said this wasn't enough to maintain a hostile work environment claim.  Indeed, it explained that "Rivera's allegation that three of Medina's officers, 'almost on a daily basis,' made derogatory comments against her, without providing context, specific dates, the precise words used, or naming the specific person involved in each instance, is too vague to satisfy the summary judgment standard." <u>Rivera-Rivera</u>, 229 F. Supp. 3d at 125.  But this reasoning just isn't right.  While we

have cautioned that "[s]tatements predicated upon undefined discussions with unnamed persons at unspecified times are simply too amorphous to satisfy the requirements of Rule 56(e) even when proffered . . . by one who claims to have been a participant," Perez v. Volvo Car Corp., 247 F.3d 303, 316 (1st Cir. 2001), the facts present in Rivera's declaration are not the fuzzy, vague details that would derail a claim at this stage of the game.[8]

Contrary to the district court's write-off of Rivera's declaration as too imprecise, Rivera provided enough detail to allow a factfinder to potentially rule in her favor. In fact, she provided information responsive to each of the deficiencies the lower court claimed existed in the declaration. On which dates did the alleged harassing behavior occur? Rivera swore that,

---

[8] For the curious, Fed. R. Civ. P. 56(e) reads as follows:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials--including the facts considered undisputed-- show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

beginning in June 2011, the mistreatment occurred <u>every</u> <u>single</u> <u>day</u> (or nearly <u>every</u> <u>single</u> <u>day</u>) until she resigned.  Which individuals at Medina were involved in the objectionable actions?  Cortés, Pepín, and Eduardo.  What type of words were used by these individuals against Rivera?  "Vieja," "old," "useless," "slow," "worthless," and in need of "social security benefits."

At the very least, Rivera provided sufficient detail to support her alleged claim.  That the district court concluded otherwise suggests that a brief clarifying discussion about the type of evidence that can acceptably support a hostile work environment claim like Rivera's is in order.  From where we sit, the district court appears to have believed that Rivera was required to produce evidence of <u>every</u> <u>single</u> <u>individual</u> offensive act directed toward her--including the exact date, exact individual involved, and exact words used. Without this, the lower court determined Rivera's claim was doomed.  But we aren't sure why the court drew that conclusion since we have never required that precise level of specificity before in a hostile work environment cause of action.  In fact, imposing such a requirement would likely create an insurmountable threshold for litigants alleging repeated harassment similar to the type Rivera claims here.  It would be unreasonable to expect the average worker in an allegedly perpetually abusive environment to keep track of her abuse to that degree of detail (lest we mandate the keeping of a

diary in anticipation of litigation, which we decline to do). In instances of alleged habitual persecution like Rivera's, one day's harassment can easily bleed into the next. Thus, where a worker being continuously harassed is able to provide information about the type of harassment (including specific words, actions, or incidents) directed at her, as well as the individuals involved in creating such an environment, such claims should generally be sustainable provided the employee can tie her mistreatment to her membership in a protected class. See Marrero, 304 F.3d at 19 (explaining hostile work environment based on sex could be shown where harassment was "more or less constant ... [as] distinguished from . . . comments that are few and far between"); White v. N.H. Dep't of Corrs., 221 F.3d 254, 260 (1st Cir. 2000) (explaining hostile work environment based on sex could be demonstrated where plaintiff showed "disgusting comments [from colleagues and superiors] . . . occurred 'everyday' [sic]"). Rivera did so here and so we have no problem concluding the information Rivera provided in her sworn statement met the specificity requirements necessary to back up her claim.[9]

---

[9] To the extent the district court seems to have taken issue with the resemblance between the contents of Rivera's affidavit and her complaint, we fail to comprehend why any supposed similarities would be a problem. Though Rivera chose not to do so, she certainly could have filed her complaint as a verified complaint and, had she done so, we would have been able to consider it as evidence in opposition to Medina's motion for summary judgment. See Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir. 1999) (explaining that "a

But wait. The district court also concluded (and Medina argues before us now) that even taking as true the statements in the sworn declaration and assuming they meet the sufficiency requirements under Rule 56(e), the alleged comments are nonetheless "too mild to form the basis of a hostile work environment claim." Rivera-Rivera, 229 F. Supp. 3d at 125 (quoting Villegas-Reyes, 476 F. Supp. 2d at 91). We disagree with this, too.

While it is true that "'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment' to establish an objectively hostile or abusive work environment," Colón-Fontánez v. Mun. of San Juan, 660 F.3d 17, 44 (1st Cir. 2011) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)), we have also made clear that "[f]requent incidents of harassment, though not severe, can reach the level of 'pervasive,' thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists." Id.; see also Flood v. Bank of Am. Corp., 780 F.3d 1, 11-12 (1st Cir.

_____

verified complaint ought to be treated as the functional equivalent of an affidavit to the extent that it satisfies the standards explicated in Rule 56(e)"). In that case, the evidence we'd consider would be identical to the complaint (since it'd be the complaint itself). Of course, then, a sworn affidavit that is merely similar in nature to the complaint is acceptable evidence.

2015) (explaining that "[w]e have upheld hostile work environment claims where harassment has been more pervasive than severe").

Here, Rivera produces evidence that she was taunted about her age nearly <u>every</u> <u>single</u> <u>day</u> for over two years. While we agree that being called "vieja" or "worthless" on discrete, isolated occasions might not rise to the level of severity necessary to demonstrate an objectively hostile work environment, we cannot say the same about incidents occurring at the alleged level of frequency claimed in this case. Keeping in mind that "[p]ervasiveness and severity are questions of fact," <u>Flood</u>, 780 F.3d at 11, and that our role here is, again, merely to referee at the "outer bounds," <u>Gorski</u>, 290 F.3d at 474, whether Rivera's evidence here is enough to carry the day is one for a factfinder, not us.[10]   We thus conclude that summary judgment was not

---

[10] We note that in reaching its decision, the district court here relied on two particular decisions (also from the District of Puerto Rico) that granted summary judgment after concluding daily or near daily discriminatory, age-based comments were not enough to establish a hostile work environment claim. <u>See</u> <u>Villegas-Reyes</u>, 476 F. Supp. 2d at 91 (D.P.R. 2007) (summary judgment granted despite evidence employer referred to the plaintiff on a daily basis as "anciana," "vieja," "abuela," and stated "she was too old and should retire"); <u>Marrero</u> v. <u>Schindler Elevator Corp.</u>, 494 F. Supp. 2d 102, 110 (D.P.R. 2007) (summary judgment granted despite evidence that that plaintiff was called "viejo," "viejito," and "viejo pendejo" "on a daily basis" by employer). These decisions, of course, are (as lower court decisions) nonbinding on us. We mention them only to make clear that neither was appealed to us and, consequently, we were never asked to determine whether the results reached by district judges in those matters were the correct outcomes.

appropriate and Rivera's age-based hostile work environment claim lives to see another day.

### b. Gender-Based Hostile Work Environment

The same cannot be said for Rivera's hostile work environment claim premised on Title VII gender-based discrimination. In support of this particular theory, Rivera relies again on her sworn declaration. She avers that beginning in June 2011, Eduardo and Pepín subjected her to constant yelling and screaming. So severe was this alleged behavior that Rivera claims she felt "physically threatened" and believed that Eduardo and Pepín were going to "hit or slap" her as a result of the various gestures they would make towards her during these outbursts. Such egregious behavior, she maintains, was never exhibited toward her male colleagues.

While we agree with Rivera that such behavior is (or at least should be) out of line in the work arena, we have nonetheless explained that "an employee claiming harassment must demonstrate that the hostile conduct was directed at [her] because of a characteristic protected by a federal anti-discrimination statute." Quiles-Quiles, 439 F.3d at 7-8. Rivera, however, has failed to connect her alleged harassment to gender at all. Sure, she mentions that Eduardo and Pepín did not engage in the same type of screaming and yelling at male employees. But that doesn't tell us much. Indeed, there is a plethora of reasons Rivera's

superiors might have yelled and screamed at her (and not at their male employees) that have no nexus to her gender. Simply put, Rivera has not done enough dot connecting for us to conclude that the harassment she alleges has as its basis her membership in a protected class--here, being a woman. Consequently, we cannot allow a Title VII-based hostile work environment claim to move forward.[11]

### 3. Retaliation

Next, Rivera tells us we must reverse the district court's decision to throw out her claims of retaliation. In order to establish a prima facie case of retaliation, Rivera must show that (1) she engaged in protected conduct; (2) she was subjected to an adverse employment action; and (3) the adverse employment action is causally linked to the protected conduct. See Noviello, 398 F.3d at 88. There is no dispute here that Rivera engaged in protected conduct when she filed charges of discrimination with the EEOC and ADU. Rather, the crux of the dispute centers on whether Rivera subsequently suffered an "adverse employment action" as a result of those filings.

---

[11] To the extent Rivera believes this screaming and yelling supports her age-based hostile work environment, we similarly see no connection between this alleged harassing behavior and Rivera's age. Moreover, in her sworn statement, Rivera only avers that her superiors "did not engage in this type of conduct against male employees." She makes no reference to younger employees.

While we have explained that adverse employment actions include, for example, "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees," Marrero, 304 F.3d at 23 (quoting White, 221 F.3d at 262), we note that the anti-retaliation provisions of Title VII and the ADEA are "not limited to discriminatory actions that affect the terms and conditions of employment." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006) ("Burlington").[12] To the contrary, "the antiretaliation provision[s] cover[] all 'employer actions that would have been materially adverse to a reasonable employee,' defined as actions that are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Ahern v. Shinseki, 629 F.3d 49, 55 (1st Cir. 2010) (quoting Burlington, 548 U.S. at 57). "This objective assessment 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" Ahern, 629 F.3d at 55-56 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)).

---

[12] Though Burlington was concerned with the anti-retaliation provision articulated under Title VII, the ADEA's anti-retaliation provision mirrors the language found in Title VII and, as such, is equally applicable in that context. See Daniels v. United Parcel Serv., Inc., 701 F.3d 620, 638 (10th Cir. 2012).

Jumping into the meat of the matter, Rivera maintains--under two different (but related) theories--that her superior (and co-owner of the company), Pepín Medina, retaliated against her in response to her EEOC and ADU discrimination charges. She claims that as a result of her reportings, the company (1) created a retaliatory hostile work environment and (2) subjected her to a retaliatory constructive discharge.[13] Rivera (like with her hostile work environment claims) relies on her sworn declaration to support these causes of action and, again, Medina maintains that the evidence provided in Rivera's statement is insufficient to allow for the claims to move past summary judgment. Given the similarities between Rivera's two retaliation theories, we more or less address them in tandem.

First, though, we provide some background on the evidence Rivera submitted to scaffold her allegations. In her affidavit (again, under penalty of perjury) Rivera explained that mere days following her filing of the EEOC and ADU charges, she began being subjected to threats of termination by Pepín. These

---

[13] While Rivera's complaint lists her constructive discharge claim as an independent claim separate from retaliation, the district court below characterized the discharge claim as a retaliatory constructive discharge. In her briefing before us, Rivera does not challenge this characterization and, more importantly, seems to adopt the district court's framing by arguing the discharge claim in tandem with her retaliatory hostile work environment claim. Agreeing that the claim has been briefed and argued as retaliatory in nature, we address it in this section of the opinion.

threats, which occurred on a "daily basis" weren't untethered. Rather, they were tied <u>directly</u> to her complaints with the enforcement agencies to whom she reported Medina's allegedly unlawful discriminatory practices. Indeed, Rivera explained that after she filed the charges, Pepín "screamed and shouted [at] me, and intimidated me by telling me that I was going to be discharged due to the discrimination charge[s] filed[,]" and that he "also referred to me with foul language, due to the discrimination charge filed." In response to the alleged harassment, Rivera took a nearly-month-long leave of medical absence, during which she complained of depression and anxiety about the harassment to her psychiatrist, Dr. Cott Dorta. But, upon her return back to work, she was "immediately" threatened once more with termination and was, again, shouted and screamed at "due to the discrimination charge filed." After another month of this supposed abuse, Rivera ultimately resigned.[14]

Medina--parroting the district court--seems to think that, at most, the behavior exhibited by Pepín toward Rivera post-

---

[14] Rivera also claims that after reporting the alleged harassment, Medina retaliated by removing her from "functions and duties of importance" and assigned her "clerical functions and duties." But she does not give us any information about what her previous job functions typically entailed nor does she elaborate on what she means by "clerical duties" or "functions of importance." Because these statements are vague to the point of being indecipherable, we do not consider them in our analysis.

EEOC and ADU charges was a mere continuation of the bad behavior that had already been inflicted upon her prior to those filings.[15] Since Rivera was comfortable reporting her allegations of discrimination and harassment in the first place, the logic goes, then the continued discrimination and harassment could not possibly have been the type that would "have dissuaded a reasonable worker 'from making or supporting a charge of discrimination.'" Rivera-Rivera, 229 F. Supp. 3d at 128 (quoting Burlington, 548 U.S. at 64). For that reason, Medina maintains Rivera's retaliatory hostile work environment claim is a dud. See Ahern, 629 F.3d at 55.

What Medina fails to see, however, is that there is a glaring distinction between the bouts of alleged harassment Rivera claims she endured before the charges were filed and the harassment she alleged afterward: namely, the latter involved threats of termination due specifically to her decision to go to the EEOC and ADU with her complaints. The evidence presented, in other words, provides a causal connection between the harassment she allegedly suffered and her protected actions. A reasonable person could surely be dissuaded from reporting her employer's discriminatory

---

[15] Medina also attempts to argue that, because the details provided in Rivera's affidavit are mere conclusory allegations that reiterate the charges in the complaint, they lack sufficient detail to support her claims. We have already rejected this argument and need not repeat our reasoning here. See supra Section D.2.a.

acts if she knows she will be continuously threatened with termination as a direct result of protesting discriminatory treatment. Given that Rivera alleges she was regularly threatened and intimidated with firing because she reported Medina for alleged discrimination, we believe there is at least a question of fact as to whether such harassment was severe or pervasive enough to constitute a retaliatory hostile work environment. We, therefore, cannot throw out Rivera's retaliatory hostile work environment claim at this juncture.

Nor do we think it is appropriate to toss away Rivera's claim of retaliatory constructive discharge. Constructive discharge can be shown where a plaintiff's working conditions were "so onerous, abusive, or unpleasant that a reasonable person in [her] position would have felt compelled to resign." Suárez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000) (citing Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 480 (1st Cir. 1993)). While "[i]t is not enough that a plaintiff suffered 'the ordinary slings and arrows that workers routinely encounter in a hard, cold world,'" Lee-Crespo v. Schering-Plough Del Caribe, Inc., 354 F.3d 34, 45 (1st Cir. 2003) (quoting Suárez, 229 F.3d at 54), we have nevertheless cited with approval the Seventh Circuit's admonition that "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may

amount to constructive discharge." EEOC v. Univ. of Chicago Hosps., 276 F.3d 326, 332 (7th Cir. 2002); see also Torrech-Hernández v. Gen. Elec. Co., 519 F.3d 41, 50-51 (1st Cir. 2008). In other words, "[a] person who is told repeatedly that [s]he is not wanted [and] has no future . . . would not be acting unreasonably if he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable." Hunt v. City of Markham, Illinois, 219 F.3d 649, 655 (7th Cir. 2000) (emphasis added); see also Burks v. Okla. Publ'g Co., 81 F.3d 975, 978 (10th Cir. 1996); Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188-89 (2d Cir. 1987); Welch v. Univ. of Tex. & Its Marine Sci. Inst., 659 F.2d 531, 533-34 (5th Cir. Unit A. Oct. 1981). Here, Rivera was told on a repeated basis that she would be fired due to her filing of the charges with the ADU and EEOC. She eventually resigned as a result. It is not unreasonable to expect that an employee will resign due to the apparent inevitability of her termination when that employee is told over and over (and over) again that she will be fired. At minimum, there is a genuine issue of fact as to whether such daily statements amounted to a constructive discharge. The district court's grant of summary judgment was, therefore, the wrong call.

## 4. The Puerto Rico Supplemental Claims

Finally, Rivera seems to challenge the district court's grant of summary judgment as to each of her supplemental claims brought pursuant to Puerto Rico law. Our precedent makes clear that the federal and Puerto Rico laws at issue largely overlap substantively. Indeed, we have explained that Law 100, for all intents and purposes, is both "the Puerto Rico equivalent of the federal ADEA, providing for civil liability in age discrimination actions," Cardona Jiménez v. Bancomercio de P.R., 174 F.3d 36, 42 (1st Cir. 1999), as well as the Puerto Rican "analog[ue] to Title VII," Monteagudo v. Asociación de Empleados del Estado Libre Asociado de P.R., 554 F.3d 164, 169 n.3 (1st Cir. 2009). We have made similar inferences about Law 69's prohibitions on gender-based employment discrimination, explaining that "the substantive law . . . appears to be aligned with Title VII law; the latter's precedents being used freely to construe the former." Gerald v. Univ. of P.R., 707 F.3d 7, 28 (1st Cir. 2013). And Puerto Rico's anti-retaliation statute--Law 115--is largely "symmetrical in scope," Velez v. Janssen Ortho, LLC, 467 F.3d 802, 809 (1st Cir. 2006), and has "parallel evidentiary mechanisms," Baerga-Castro v. Wyeth Pharms., No. 08-1014 (GAG), 2009 WL 2871148, at *13 (D.P.R. Sept. 3, 2009) (citing Sanchez Borgos v. Venegas Const. Corp., No.

07-1592 (SEC), 2009 WL 928717, at *6–7 (D.P.R. Mar. 31, 2009)), to

the anti-retaliation provisions in Title VII and the ADEA.[16]

In light of this, then, we reinstate Rivera's Law 100

age-based hostile work environment claim for substantially the

same reasons we outlined above in our discussion of Rivera's

federal claim. See Thermo King, 585 F.3d at 452 n.7 ("Law 100

provides similar protection against age-based discrimination as

that provided by the ADEA. Under Law 100, however, plaintiff's

burden is lighter. . . ."). So, too, can Rivera's Law 115

retaliation theories progress to a jury. See Velez, 467 F.3d at

---

[16] It is clear from Rivera's Notice of Appeal that she challenges the district court's grant of summary judgment on all of her claims (including the Puerto Rico-specific ones). In her briefing, however, Rivera seems to rely on the similarities between the federal anti-discrimination statutes and their Puerto Rico counterparts to justify a less-than-fulsome discussion of the latter. Indeed, while she tells us we have jurisdiction over these specific causes of action, the statutes underlying the claims are never referenced outright outside of the brief's jurisdictional statement and there is no obvious legal discussion of the particularities of the Puerto Rico law in Rivera's analysis. We will, nonetheless, entertain the Commonwealth claims here. This is so because, as noted above in the body of our opinion, the parallels between the federal and Commonwealth statutes generally allow plaintiffs who can satisfy the former to similarly meet the requirements of the latter. We have gone this route before, see Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 26 n.10 (1st Cir. 2011) (addressing a Commonwealth anti-discrimination claim despite the fact that "the parties [did] not substantively brief the merits of the [Commonwealth] claim on appeal as distinct from the [federal] claim"), so our case law gives us some leeway to traverse that path once again here. That being said, we want to remind attorneys that we expect developed argument on all issues on appeal, including Puerto Rico anti-discrimination claims which arise from the same set of core facts as their federal counterparts.

809 (suggesting there is no distinction between the prima facie showing of a federal and Law 115 retaliation claim); see also Wirshing v. Banco Santander de P.R., 254 F. Supp. 3d 271, 277 (D.P.R. 2015) (explaining that "the federal courts . . . have consistently treated a claim under Law 115 the same as a claim pursuant to Title VII's [or the ADEA's] antiretaliation provision").[17]

As for Rivera's Law 100 and Law 69 claims sounding in gender discrimination, they must be discarded since we have already concluded that Rivera has fully failed to show any discrimination based on gender at all. See supra Section D.1 and Section D.2.b.

Rivera also brought a claim under Puerto Rico Law 80, which "requires employers to compensate at-will employees who are discharged without just cause." Ruiz-Sánchez v. Goodyear Tire & Rubber Co., 717 F.3d 249, 254 (1st Cir. 2013). Unlike the previous Commonwealth claims just discussed, this particular Puerto Rico-based claim does not have a federal equivalent--at least not one brought by Rivera. Because Rivera provides no discussion at all about Law 80 in her brief, and because we cannot say any of our

---

[17] Law 115 is not fully identical to the anti-retaliation provisions of Title VII and the ADEA. While Title VII and the ADEA protect both "employees [and] applicants for employment" against retaliatory discrimination, 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 23(d), Law 115's language is more narrow, appearing to only cover "employees." See P.R. Laws Ann. tit. 29, § 194a(a). Because Rivera was not an applicant for employment, however, this distinction has no bearing here.

prior discussion informs the vitality of that specific claim, we deem it waived and need not address it. See Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988) (explaining that "a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace" (citation omitted) (quoting Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990 (1st Cir. 1988)).

### E. The End

To wrap it up, the district court is affirmed as to its grant of summary judgment on the discriminatory wage disparity claims and the gender-based hostile work environment claims (under both federal and Commonwealth law), as well as to its dismissal of Rivera's Law 80 claim. But it is reversed as to the federal and Commonwealth age-based hostile work environment claims and retaliation claims. Costs to Appellant.